In the Interests of W.G., S.G., D.G., W.G., K.G., J.G., and N.G., Children,

**J.G. and P.G., Appellants.**

No. 83–554.

Supreme Court of Iowa.

May 16, 1984.

Rehearing Denied Aug. 16, 1984.

Gary K. Anderson of Anderson & Wheeler, Council Bluffs, for appellant father. Gregory L. Waggoner of Waggoner & Walters, Council Bluffs, for appellant mother.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Sp. Asst. Atty. Gen., and Brent D. Hege, Asst. Atty. Gen., for appellee State of Iowa.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, McGIVERIN, and LARSON, JJ.

HARRIS, Justice.

This is a statutory proceeding seeking termination of parent-child relationships between natural parents and seven of their children. The district court determined the State established grounds for terminating the relationships. We affirm the district court and, so doing, we vacate a contrary decision of the court of appeals.

█ The parents think this controversy centers on two beliefs held by the father and now also subscribed to by the mother. The father is committed to an agrarian lifestyle which, if not primitive, is at least starkly simple. And he states he strongly believes in corporal punishment in the rearing of his children. We wish to make it plain at the outset that we think neither of these views are at issue here. The parents' lifestyle is of concern here only if it appears to have adversely affected the children. The law clearly gives parents who are so inclined the right to inflict reasonable corporal punishment in connection with the rearing of their children. We

have always required the right to be exercised reasonably. In *State v. Bitman*, 13 Iowa 485, 486 (1862) we said:

> It is the right of a parent to chastise his child, but when such chastisement amounts to cruelty or inhumanity, or where ... the parent or master goes beyond the line of reasonable correction, his conduct becomes more or less criminal.

What is at issue here is cruelty to children. The evidence of its existence is overwhelming and the extent of it far exceeds what can be tolerated in a civilized society.

The mother was born in 1942 and holds a college degree in home economics. She was an elementary school teacher in Wisconsin before and during the early years of her marriage. She and the father were married in 1968, and have since resided in Wisconsin. The father's farm background, and general outlook on life, were vastly different from the mother's. The father wrote the following in a letter:

> Those who can do and those who can't teach.... My father beat me because he loved me. I love him because he beat me and show me the right way. I'm honest I work hard I dont steal. I dont lie. I don't cheat I am charitable I love people and living things and I beat people to show them the right way. Kiss my foot if you don't like me. You losers and projectionists. Come on over and I'll show you some love with a whip.

Eight children were born to the parents; the youngest is not involved in this proceeding. Six of these children were born on the farmstead. The mother also had two miscarriages, and another child who died at four weeks of age.

The district court filed extensive findings of fact. On our *de novo* review we reach the same factual conclusions. Indeed, any close reading of the testimony of the parents discloses there is little disagreement about the material facts. They were developed at both the CHINA and termination hearings. As the district court's findings are both careful and perceptive, we quote from them the following, which we adopt as our own:

> [The mother] and her seven children left their Wisconsin home on December 23, 1980. [She] had contacted the Jefferson County [Wisconsin] Human Services Department by telephone on December 17, 1980, requesting assistance. That agency had provided assistance to the family about eighteen months before when [the mother] had previously left her husband. She described her husband ... as physically and emotionally abusive, with the most recent episode of physical abuse resulting in her receiving a blackened eye about two weeks [previously]. She was also concerned because [the father] had stated he would no longer allow the children to receive medical attention, no matter what. She expressed fear and apprehension for the safety of herself, her children, and her parents if she were to leave him. She wanted no one from the agency to come to the farm, for there was "no telling what he'd do." After some discussion [the mother] was advised she must make a decision about leaving, and was assured of agency assistance. She called again several hours later requesting assistance to leave immediately.
>
> Transportation was provided by [the agency, and the mother] and her seven children left the farm. This was the fourth time she had left her husband since 1977. Arrangements were made for food, lodging and medical examinations. After discussions between [the mother] and agency workers, which included examination of potential Wisconsin court involvement, [the mother] opted to come to Council Bluffs, Iowa, where her parents live.

The children were adjudicated in need of assistance in March 1981. Extensive agency efforts to improve the family situation were made both before and after the CHINA hearing. The efforts were to no avail. As stated by the district court:

> [The father] now feels more confident in his beliefs, and believes he has made no errors in the discipline of his children

or wife. In testimony [the father] espouses a sequential acceleration of consequences for effective discipline, to wit:

(a) try to reason with the child,

(b) removal of privileges,

(c) corporal punishment pursuant to what the Bible says,

(d) then call on society and the judicial system.

In the past his discipline techniques have included:

(a) the utilization of machinery "v" belts and boards to spank his children and wife,

(b) kicking his children,

(c) spanking and slapping his children for "needless" crying until they stopped crying,

(d) verbally haranging and berating his wife and children for hours or days, and

(e) physically disciplining his wife in the children's presence.

[The father] believes corporal punishment must hurt—it has to sting—in order to be effective. Corporal punishment of his wife was necessary as he wanted to "subdue and stop her wrongful activities that would cause harm to the children." [The father] anticipates no change in his method of discipline.

. . . .

[The father's] philosophy of life centers around his "independence from commercial exploitation"—self-sufficiency to the point of needing little money for the purchase of goods or services from outside the family farm. He claims his religious principles—traditional Catholic—were formed from the time he was six months to one year in age. As husband he is the absolute head of the family. He must control all decisions of family life. He voices a strong belief in the unity of a man's family.

[The father's] belief in family unity, however, does not extend beyond his immediate offspring. He has apparently had no contact with his parents for about ten years. He had prevented [the mother] from having contact with her parents for more than five years. He believes his wife's parents ... carry on a passive sabotage of his farm operation through [the wife]. Any mishap on the farm is proof of this "sabotage." Lost business opportunities (real or imagined), the escape of cattle from confinement in pen or fenced field, the death of livestock (cattle, calves, or chicks), even the overflowing of the water trough are all examples of active sabotage against him. These acts have been the cause for corporal punishment of the children and [the mother].

The mother, as a result of what one expert called the "classic" battered-woman syndrome [1] is now reconciled with her husband's theories of severe discipline. She states she now subscribes to them. Those views were described in the mother's testimony at the CHINA hearing as follows:

Q. Did he ever have occasion to beat the children, too, Ma'am? A. Oh—very seldom. It was usually me but the children were included on some occasions.

Q. Concerning the children, you indicated that he didn't beat them or hit them, abuse them very frequently, but in your affidavit you indicate that he would not allow the children to cry? A. That's true. If they fell down and hurt themselves when they were playing or scuffling or whatever, if they started to cry he would immediately say, "Don't cry, it's your fault you fell down" or "Your fault you got hurt. You were clumsy." They were not allowed to cry for anything that might have caused them to cry.

Q. At what age did he start to initiate this behavior on the children? A. The youngest that—real definite one that I could see was when [W.] was about, let's see, he was still sleeping. When they

---

1. The syndrome was described in these terms: the mother struggled with simple decisions; she was complaint to authority; she transferred many of her dependency needs to the agencies in both Wisconsin and Iowa.

were born they were placed in a dresser drawer because we didn't have a crib. He was less than three months old, he was still in the dresser drawer. I came in the house and my husband was talking on the phone and it always irritated him when there was any other noise. [W.] was missing. I went looking for him. He was in the closet with the heavy coat over top of him. The coat had fallen down. He was sweating and all red and coughing. This wasn't directly inflicted discipline by him but it was an attempt to keep the child quiet.

Q. Was it that he could not stand crying or did he think it was a part of the person's character not to cry? A. The child should not be allowed to interfere with the father in any way. When the father was doing business or associating with other people.

Q. I believe you referred to him in his letters about his answers to this type of discipline, what other things did he do to the children? A. He would yell at them. Tell them they were stupid. Things like this, belittle them. He would hit them with a belt. Slap them with his hand, kick them.

. . . .

Q. Did you ever have to, by either his force or by your own desire, participate in commanding your children to not cry or slap them, beat them in any way? A. Yes. He commanded that I discipline the children also because he felt if he was the only one disciplining the children this way they would resent him and not me. And so he would tell me to discipline them. If I didn't discipline them, he would discipline the children himself and then he would beat me up. I felt—or I had the opinion and I thought if I would discipline the children, it would not be as harsh on them as if he would have done it, so. . . .

Q. What type of discipline would you exercise? A. Spanking, using the belt on them, things like this.

At the termination hearing, the mother again described the father's discipline of the children:

Q. Were welts ever caused by any of the strikings? A. Yes, sometimes.

. . . .

Q. What, in terms of number, what's the most welts that you ever saw on one of your children? A. I would say about four or five.

She also testified at length about the father's abuse against her. At the CHINA hearing she stated:

Q. Well, let's go back to your statements regarding the times he would beat you. What did he beat you with? Did he use his hands? What did he use, Ma'am? A. He used his hands, he used pitchfork handles, he used a little coal shovel that we used for our cook stove, he used boards, hammer handles, tools, two-by-fours, and most of the time it would be an implement belt, an old implement belt. Sometimes it was a belt that he was wearing that had a metal clip on the end of it.

Q. And in your affidavit you state on one occasion, and I don't recall which child's birth it was, an incident where you gave birth to the child and then were required to go back out and assist your husband in the field, is that correct? A. This particular child was born and the cows got out in the hayfield, and this is about approximately three hours after the birth of the child and he told me to go out and chase those cows and it was my fault that the fencer was not working and he had left the gate open which disconnected the rest of the fence. So no electric charge going through it. He told me to go out there and chase those cows. Then he kept yelling at me, "I hope you die. I hope you die."

Q. And did you do that? A. Yes. I chased them in.

Q. Had you not done that would you have received a beating. A. Yes.

The father's own testimony does not significantly contradict the foregoing description. In his own testimony, he stated:

Q. [Y]ou testified that corporal punishment is the last resort when you discipline the children; is that correct? A. That's correct.

Q. How much did you punish your children corporally? A. I would say each child, by the time they were around seven years old, by that time they had pretty well reached the age of reasoning and understanding mostly everything, and they know that you are very concerned; and in my case, my children, by the time they got to be about seven, if fifty times throughout their life, then, so that would be about maximum.

Q. Fifty times apiece? A. I can't say each one needed that; it all depends upon how their character becomes developed, see.

Q. How would you punish them corporally? A. I would use a wide belt, one about that wide, that I used; and I used my open hand and a switch. Little switch or tree switch, something like that. It has to sting. I've got to be very honest with you, it has to hurt; there has to be pain. The pain—ha, ha, ha, ha—I see how it's sort of stirring you up; but there has to be a pain that reminds them of the fact that they're bringing injury and pain to someone else, see.

Q. Do you ever use instrument belts? A. You're talking about machine belts. Yes, I've used a machine belt.

Q. What are those made of? A. Well, they're leather and rubber and that sort of thing.

Q. When you used the belt that you used, the machine belt, or switches, did that leave welts on them? A. On occasion they do.

There is no need to extend this opinion by further references to the father's commitment to physical violence. We find that his stated belief in corporal punishment is a transparent rationalization for his brutality and cruelty. His angry outbursts, at best, had very little to do with directing his children's upbringing. They were almost entirely manifestations of his own passions.

His claim of some lofty motive to direct his children in the right path is a sham.

The impact of this violence upon the children has been vast. Again, we adopt the findings of the district court:

The children all received physical, dental, psychiatric, and psychological examinations in February or March 1981. All appeared to be in general good health and, though thin, were well nourished. The four oldest children were evaluated to be in the normal range of intelligence.... These four were evaluated to have an adjustment disorder with mixed emotional features—predominently: anxiety, depression, feelings of inadequacy, withdrawal, and paranoid-like feelings.

. . . .

All the children were placed in [a] foster home.... [They] were generally in good health, though all were very thin and had pin worms. None were completely toilet trained, even the nine-year olds. All were quiet, withdrawn, and described as infantile. [The foster mother] described these children as more fearful and withdrawn than other children in her experience. The children expressed fear of being beaten if they wet the bed or dropped food to the floor.

The district court concluded the state established the grounds for terminating the parent-child relationships under both Iowa Code sections 232.116(3) (1983) (past physical abuse) and 232.116(5) (future harm).

■ I. The general rules controlling our review are not in dispute and are well settled:

Several previously enunciated principles have served to guide our examination of the record before us. Appellate review of proceedings to terminate a parent-child relationship is *de novo;* thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." [Authority.] We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses whom that court heard and observed firsthand,

but we are not bound by those findings. [Authority.]

Central to a determination of this nature are the best interests of the child. [Authority.] In this connection, we look to the child's long-range as well as immediate interests. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing. [Authorities.]

*In the Interest of Dameron,* 306 N.W.2d 743, 745 (Iowa 1981).

Under Iowa Code section 232.116(3), the court may order termination if it finds that one or both parents has physically abused the child, that the court has previously adjudicated the child in need of assistance after finding physical abuse, and that the parents were offered services to correct the situation which led to the abuse. "Physical abuse" is defined as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian or custodian or other person legally responsible for the child." Iowa Code § 232.2(37). *See also* Iowa Code § 232.68(2) (definition of "child abuse").

Under Iowa Code section 232.116(5), the court may order termination if it finds that the child has been adjudicated in need of assistance, that the child's custody has been transferred from the parents for twelve months, and that, if returned to the parents' custody, the child will suffer harm in the manner specified in Iowa Code section 232.2(5). One of the harms specified in that section is physical abuse. *See* Iowa Code § 232.2(5)(b).

II. The only question is whether there is clear and convincing evidence which establishes prior or probable future physical abuse of the children. We think both are conclusively established by the testimony of the two parents alone.

The abuse we have identified relates mainly to past events. But a clear picture of probable future abuse also emerges from the testimony. The father testified that he will expect the children to contribute more and more to his enterprise as they grow older. In his case, however, this expected contribution is something quite beyond the efforts normally expected of members of a farm family.

We know from the brutal and abusive treatment of his wife what will happen when a child fails, as a child inevitably would, to conform to his standards in performing farm duties. The children would seem to him to be "sabotaging" his farm. There would again be frequent and harsh beatings. This is the father's philosophy and he refuses to change it. We cannot submit the children to such a future.

Most of the direct abuse was at the hand of the father. In a sense the question, as it relates to the mother, is more painful, but we think it is no less clear. The statute wisely provides that the relationship of both parents may be terminated upon a finding that either has abused or either is imminently likely to abuse the child. The mother testified she now subscribes to the father's views on what they consider to be appropriate child discipline. Hence, we are not faced with a claim that the mother was forced to choose between her husband and her children. We do not suggest the outcome would necessarily be different in such a case. To an abused child the blows are intolerable either way.

The district court was correct in ordering termination.

DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT AFFIRMED.