**In the Interest of R.C., K.C., L.C., and G.C., Minor Children,**

**F.C., Father, Appellant.**

**No. 94–211.**

Court of Appeals of Iowa.

Aug. 25, 1994.

Michael D. Blazek of Reed, Blazek & Lynch, West Des Moines, for appellant F.C.

Bonnie J. Campbell, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Judy A. Sheirbon, Asst. Atty. Gen., and Michael Hunter, Asst. County Atty., for appellee.

Kathryn Miller, Des Moines, guardian ad litem for minor children.

Considered by DONIELSON, C.J., and HABHAB and HUITINK, JJ.

DONIELSON, Chief Judge.

Fred and Sheila are the natural parents of Ricky, born December 17, 1987, Gary, born December 3, 1988, and twins Kevin and Lisa, born June 14, 1990. The family moved to Iowa in late 1990 after living in Missouri and Nebraska. Both Fred and Sheila had been investigated in Missouri and Nebraska for potential child abuse and neglect. These investigations centered on allegations of excessive discipline, unsafe and unsanitary conditions, homelessness, and lack of parenting skills. The twins were diagnosed as failing to thrive. In December 1990, a founded denial of critical care child abuse report was made against Fred and Sheila for failing to provide proper medical care, shelter, clothing, and supervision. The two oldest children, Ricky and Gary, were diagnosed with developmental delays and therapy was recommended.

In February 1991, Fred and Sheila completed a family preservation program. In March 1991, a child abuse referral was made because of missed doctor appointments for

the twins and failure to bring Ricky to fifty percent of his speech appointments. A child abuse investigator made an unannounced visit to the home and found severe health and safety concerns in the home. The investigator observed both twins had severe rashes on their lower extremities and their legs were swollen. The rooms in the home were littered with rotten food and dirty clothes. There also were knives within reach of the children. The investigator observed Sheila crying and yelling during the interview. The children were observed hitting each other and paying no attention to their mother's attempts to discipline them. Another visit a month later found conditions were the same or had deteriorated. Following a doctor's visit in April 1991, a founded denial of critical care report was filed.

Shortly after the report was filed, the State filed a children in need of assistance proceeding, based on Fred and Sheila's failure to provide adequate medical care, clothing, and shelter for the children. A family preservation program was implemented. Although the social worker reported some progress had been made, she had doubts either Fred or Sheila could maintain this progress at the conclusion of services. The family began an intensive eight-week program, at which time Fred was diagnosed as having low intellectual functioning and was observed to be very strict and demanding with the children. Sheila was overwhelmed by the responsibilities of caring for the twins. Despite these efforts by the State, social workers still found the family was having a difficult time meeting the goals of sanitation.

In December 1991 the parents were evicted from their home and moved to a shelter, where hygiene again became a concern. In April 1992, a founded denial of critical care was made when a social worker found Gary locked in his room covered with feces. The twins were observed engaging in self-abusive behavior. Finally, on April 14, 1992, the children were removed from the parents' home and placed in foster care. During the first six months of foster care, the parents were given three hour visits weekly with the children. The children's behavioral problems improved. As the visits were increased to

six hours, the social workers observed Sheila was becoming more detached from the children. Fred, while very strict and inflexible, was very loving towards the children.

On December 11, 1992, the parents were given their first unsupervised visit. Within the first two hours a child abuse referral was made when a social worker dropping off the twins discovered Kevin on the icy roof of the porch. Fred and Sheila did not know he was on the roof. The visits ultimately were cut back to three hours.

In April 1993, the social workers recommended parental rights be terminated. The permanency order entered April 1993 adopted the case permanency plan which recommended terminating parental rights. In July 1993, Sheila left Fred and had no further contact with the children for several weeks. Sheila later contacted a social worker and stated Fred had sexually and physically abused her and the children and wanted to start over.

Fred continued to visit the children frequently during the summer. However, the children's behavioral problems began to accelerate. On August 24, 1993, the State filed a petition for termination of parental rights. Sheila did not attend the hearing. Fred argued he would be able to care for the children himself, but thought Sheila might return to him if he obtained custody. On January 10, 1994, the district court terminated both parents' rights to all four children. Fred appeals. We affirm the juvenile court.

■ Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984) *cert. denied sub nom. J.G. v. Tauke*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

Fred advances two arguments. First, he asserts the juvenile court did not follow the statutory time period when it instituted termination proceedings before the six month review of the permanency order. *See* Iowa Code § 232.104(2)(b) (1993). Second, he argues the State prematurely ceased working

to reunite the family. *See* Iowa Code § 232.102(7). We address each argument in turn.

■ Fred contends the State never sought to invoke the jurisdiction of the juvenile court to modify the permanency order, and proceeding with a hearing on the termination petition was not an appropriate exercise of the court's jurisdiction to modify the permanency order. He asserts the permanency order was made pursuant to Iowa Code section 232.104(2)(b), continuing the foster placement for six months. He argues the statutory six-month review period must be allowed to run before modifying the permanency order. We disagree.

First, we do not agree the permanency order was made pursuant to section 232.103(2)(b). The order did not continue the children's placement. Their custody had been temporarily with the Department of Human Services (DHS). This order placed their permanent custody and guardianship with DHS. The case permanency plan adopted by the order clearly states the goal is termination of parental rights by June 1993. We conclude, as did the juvenile court in the termination proceeding, the permanency order was not made pursuant to section 232.104(2)(b).

■ Even if we assume section 232.104(2)(b) applies, the juvenile court did not err in proceeding to terminate parental rights within the six-month review period. Fred asserts this is a minimum period which must run before review or modification. We determine such an interpretation would lead to absurd results. It would deprive the court of jurisdiction to protect the best interests of the child, which is our primary concern. *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981); *see* Iowa R.App.P. 14(f)(15). To understand section 232.104, we resort to statutory construction. *Metier v. Cooper Transp. Co., Inc.,* 378 N.W.2d 907, 912 (Iowa 1985). We may consider the language used in the statute, the objects sought to be accomplished, the evils and mischief sought to be remedied, and place a reasonable construction on the statute which will best effectuate its purpose rather than defeat it. *Id.* We must examine both the language used and the purpose for which the legislation was enacted and consider all parts together without giving undue importance to one single or isolated portion. *Id.*

■ Chapter 232 is to be construed liberally to achieve its purpose of advancing the child's welfare. Iowa Code § 232.1. Section 232.104(6) sheds light on our understanding of 232.104(2)(b). The clear intent of the language, "the review shall be in a hearing that shall not be waived or continued beyond twelve months after the permanency hearing or the last review hearing" is the time period is a maximum, not a minimum. Iowa case law also clearly holds we do not allow children "to suffer indefinitely in a parentless limbo." *In the Interest of T.A.L.,* 505 N.W.2d 480, 485 (Iowa 1993) (quoting *Long v. Long,* 255 N.W.2d 140, 146 (Iowa 1977)). We cannot interpret the statute to prevent the court from acting in the child's best interest. Therefore, even if section 232.104(2)(b) applied, we determine the court has jurisdiction to consider a petition to terminate parental rights during the six-month review period.

■ Fred also argues the State prematurely ceased efforts to reunite the family. We disagree. These children were adjudicated CINA in April 1991. Services were provided to the family to keep the children in the home. After the children were removed, services continued in an effort to reunite the family. The various case permanency plans reflect the services provided and the goals pursued. The case permanency plan adopted in the permanency order of April 1993 stated its goal to be termination of parental rights by June 1993.

■ By the time the petition to terminate parental rights was filed in August 1993, the family had been receiving services for over two years and the children had been out of the home for sixteen months. We view cases where the children have been out of the home for more than twelve months with a sense of urgency. *In the Interest of L.L.,* 459 N.W.2d 489, 495 (Iowa 1990). The evidence in the record is clear and convincing the children are in need of assistance and cannot safely be returned to their father's

care. The State provided services and sought first to maintain the family unit, then to reunite the family. The State did not prematurely cease its efforts to reunite the family. By the time the permanency order was filed, the statutory requirements for termination of parental rights already had been met. The State met its burden of proving the elements of sections 232.116(1)(e) and (g) in the termination proceeding. The court properly terminated the parents' rights to these children.

**AFFIRMED.**

SACKETT, Judge (specially concurring).

The majority has terminated the parental rights of two boys born in 1987 and 1988 and twins born in 1990. The parents are poor. They kept a dirty house, did not keep the children clean or in the proper clothing, and did not properly discipline the children. There is no contention the parents sexually or physically abused the children.

The father appeals the termination contending he loves the children (which does not seem to be questioned) and with more time and with help he could assume their care. The children are in foster homes, and the foster parents have had a number of services offered to them to assist with the children's care.

The two older children have problems in their foster homes and have been determined to be children with special needs and special behavioral problems. There is no assurance the older children will be adopted and the evidence was the older child would have to be kept in foster care for a year before there would be an attempt to find an adoptive placement. Apparently, there was evidence the twins would be adopted but I am not certain from reading the record specifically what plans have been made for the twins.

The result of this termination is the children will have their biological ties cut, not only with their birth parents but, also, with their siblings.

The father said with additional time and some of the services offered to the foster parents, he could care for the children. I agree with the majority that this family has had extensive services. They have apparently not cured the family's problems. Whether the services were not correctly tailored to the family's needs or whether the parents failed to cooperate with the services, I cannot tell from the record, although, I would assume both factors came into play when the services failed. I do know the state of Iowa has spent considerable money on this family as evidenced by the volume of reports in the file. When the state fails to keep a family together, we should look critically at what has happened and ask if the services offered are good and directed to the problem.

If these children are placed soon in stable adoptive homes, they probably will be better off as a result of this termination. If they are not adopted and remain adrift in foster care with no parents to love them and look out for them, they may have been better off in the care of their parents with their biological ties intact even if the continual delivery of services to their father was necessary for him to care for them.

I have difficulty voting to affirm termination of parental rights on a record that supplies no clear evidence the children will go to stable homes. The secrecy that exists in these cases curtails the courts' and public's knowledge of the true picture of the number of children whose parental rights have been terminated who are waiting for adoption.[1] Furthermore, we have no knowledge of the outcome of an adoptive placement. I have fears, that despite our good intentions, we may not be operating in the interest of the children. I reluctantly concur.

---

1. In 1992, of the 263 special-needs children freed for adoption, only 138 were adopted. *See* Phoebe Wall Howard, *Special-needs Kids Pray for*

*New Families, New Lives,* Des Moines Sunday Register, October 10, 1993, at 1A.