# IN THE COURT OF APPEALS OF IOWA

No. 17-0740
Filed September 27, 2017

**IN THE INTEREST OF D.B., T.B., A.M., and A.T.,**
**Minor Children,**

**STATE OF IOWA,**
      Petitioner-Appellant,

**JAMI HAGEMEIER, Guardian Ad Litem,**
      Appellant.
_____

      Appeal from the Iowa District Court for Polk County, Susan C. Cox, District Associate Judge.


      The State and guardian ad litem appeal from the dismissal of the child-in-need-of-assistance petitions. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

      Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellant State.

      Jami J. Hagemeier of Williams & Hagemeier, P.L.C., Des Moines, guardian ad litem for all appellant children, and attorney for A.M. and D.B.

      Sharon M. Wegner of Graham, Ervanian & Cacciatore, L.L.P., Des Moines, attorney for T.B. & A.T.

      Thomas P. Graves of Graves Law Firm, P.C., Clive, for appellee mother.

Aaron H.R. Ginkens of Ginkens Law Firm, P.L.C., West Des Moines, for appellee father of D.B. & T.B.

Daniel M. Northfield, Urbandale, for appellee father of A.M.

Dale D. Mays of Mays and Clausen Law Office, Newton, for father of A.T.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**DANILSON, Chief Judge.**

The State and the guardian ad litem appeal from the dismissal of the child-in-need-of-assistance (CINA) petitions, which alleged the children were CINA pursuant to Iowa Code section 232.2(6)(b) and (c)(2) (2017). Because the State proved by clear and convincing evidence that A.T., T.B., and D.B. should be adjudicated CINA, we reverse and remand with directions. We affirm the decision of the juvenile court dismissing the CINA petition as to A.M.

**I. Background Facts.**

Alicia and Christopher are married and have five children between them. A.M., age fourteen, is Alicia's child with Michael. M.B., age eleven, is Christopher's child with A.L. (who lives in Florida).[1] A.T., age twelve, is Alicia's

---

[1] M.B. is a behaviorally challenging child. M.B., A.L., and Christopher received informal services from the department of human services (DHS) from November 2007 through March 30, 2009. The juvenile court was formally involved beginning March 30, 2009, when a CINA petition was filed. On July 16, 2009, M.B. was placed with her father and his then-fiancé, Alicia. Fifteen days after placement, M.B. had an unexplained injury.

On August 20, 2012, M.B. was removed from the home of Christopher and Alicia upon a finding by the juvenile court that she "is clearly the target child of physical and emotional abuse." The juvenile court found T.B., A.M., and A.T. "also experienced or witnessed corporal punishment and are in imminent risk of the significant abuse levels already perpetrated against" M.B. That court stated further,

> If only M.B. is removed, it is likely that one of the other children will be targeted, especially if one has a toileting accident. The parents must resolve their anger, bullying, and blaming behaviors, understand and accept their role in the harm they have perpetrated, learn and practice positive parenting techniques, and heal their relationship with their children before they can provide minimally adequate parenting.

Those juvenile proceedings were closed in 2014.

A therapist and former child protective service worker with DHS, Angye Jones, was familiar with the family through earlier juvenile court proceedings. Ms. Jones testified at the instant hearing, stating M.B. had disruptive behaviors including dishonest, sneaky, stealing behaviors. She testified further:

> When I left in April 2014, the case was transitioning to Jona Parks who had just started at the department and had been the [Family Safety, Risk, and Permanency] FSRP worker on the case. In consultation with [the children's therapist] Eileen Swoboda and several people I told Jona that my recommendation at that time would be for the case to close . . . .

child with Randy. T.B., age six, and D.B., age seven months, are Alicia's children with Christopher. Alicia is employed as a certified medical assistant. Christopher is a trucker who is on the road several days a week. Due to Christopher's absence, Alicia was the primary caregiver for all the children.

Alicia and M.B. have had a difficult relationship. M.B. continued to see a therapist after the previous juvenile court proceedings were closed. In August 2016, Alicia and Christopher had M.B. undergo a psychological examination, which indicated M.B. is mentally lower functioning, has "strong emotional reactions," and "directs her negative emotions towards others in her life [particularly Alicia, so] that she can then blame them for the loss of her fantasized perfect relationship with her father."

---

Q. Do you have any other problems in that case you think should be addressed? A. I don't know that I call them problems. I think it was a very complex case. I think there was a lot of factors. There was a lot of emotion involved I think from all the parents, but the biggest, I think, discovery for me as the case went on, I felt like [M.B.] had a lot of behavior problems that maybe weren't . . . focused on in the initial assessment . . . .

Q. At the end though when you left the case, did you feel that the children were safe in the [B.] household? A. I felt that it was safe to send them home largely because we had had so much work with the children's therapist, especially Eileen Swoboda, which at that time was seeing [M.B.], and we had so many meetings and so many consultations, and at that time Judge Cohen was very clear that she was going to base her decision on—largely on what Miss Swoboda recommended. And so at the time I was leaving Miss Swoboda was recommending that [M.B.] be returned to the home at this time.

Q. Do you have any personal concerns about safety of any of the children in the [B.] home? A. When I closed the case I felt like things were safe at that time.

Also in August 2016, five days after giving birth to D.B., Alicia had a "massive heart attack," which requires a lifelong need for medication. She is to keep her "stress level down." [2]

In November 2016, A.M. went to live with his father, Michael.

On January 25, 2017, by ex parte order, M.B., A.T., T.B., and D.B. were removed from Alicia and Christopher's home based upon a report to DHS that Alicia had hit M.B. and caused a bloody nose.

Six-year-old T.B. was interviewed and stated that M.B. gets spanked with a spatula, Christopher slapped M.B., and M.B. had a bloody nose. In an interview with a child protective worker, M.B. reported being hit in the face by her father and being consistently grounded or in trouble. She also reported having to eat hot sauce with added cayenne pepper as punishment; not receiving any gifts for Christmas; being told she is "fat, stupid and bad"; being punished for loading the dishwasher wrong; being beaten with a spatula; being forced to perform wall squats or run up and down the stairs for extended periods of time; and being forced to stand at the dinner table while everyone else got to sit.

The State sought to have D.B., T.B., A.T., and A.M. adjudicated CINA pursuant to Iowa Code section 232.2(6)(b) and (c), asserting they were at risk of physical or emotional harm as a result of abuse or neglect by Alicia and Christopher. After the removal and adjudication hearing had begun,[3] and before

---

[2] Prior to D.B.'s birth, Christopher was home about one day a week. However, at the time of the CINA hearing, Alicia stated Christopher was home "a minimum of two times during the week plus weekends."

[3] The hearing was conducted over the course of six days—March 2, 7, 13, 14, 15, and 16.

the State presented all its evidence, the court issued an order returning D.B. to his parents.[4]

All parties stipulated to M.B.'s continued removal and CINA adjudication. A.M. remained living with Michael, who stipulated to A.M.'s removal and CINA adjudication. While Alicia agreed with A.M.'s placement with Michael, she contested adjudicating A.M. a CINA.

Chelyne Cunningham testified she was the therapist for A.T., T.B., and M.B. She starting seeing A.T. in 2015 "because she was having some acting out behaviors at home and at school due to relationship stressors that she had with her father and potential abandonment that she was experiencing with them not having a strong relationship." Ms. Cunningham testified A.T. consistently denied any abuse in Alicia and Christopher's home as to herself or her siblings.

Ms. Cunningham stated she also started seeing M.B. five or six months after sessions started with A.T.:

> [M.B.] was brought to my office because she was having acting out behaviors at home and at school which presented oddly for her age for some of the things she was doing or not doing. So as an example hygiene or lack thereof. Issues were brought up just her not having some of the same interests that children her age generally would have.

Ms. Cunningham recommended a psychological evaluation be prepared for M.B. She was asked if M.B. is "good at accepting responsibility for her actions?" Ms. Cunningham stated:

---

[4] The State filed an application for interlocutory appeal, which was denied by the supreme court. On appeal here, the State urges it was denied a fair trial by the court's return of D.B. partway through its evidence. We find the issue is moot. In any event, the State had ample opportunity to present its evidence in support of the CINA petitions.

Not at all. She—and that was another reason for the request for the psychological evaluation. When I was stating that she seems delayed, she has a very difficult time being accountable, and she—even when you ask her about something that she's done, you would get a very what we call matter of fact a very blank stare almost as if she, you know, went to another place and didn't know what you were talking about.

Q. She denied that behavior that was reported to you? A. She wouldn't speak, and with continued probing some sessions I would have better luck with her stating, yes, I did that thing whatever that thing was by the end of the session, but the majority of the time especially when accountability issues were brought up [M.B.] would just be silent and blank.

Q. When you talk about these behaviors, are these the kind of behaviors that are just a little naughtiness from a child or are they kind of behaviors that might create a danger to herself or others? A. Absolutely.

Ms. Cunningham stated M.B. did not tell her about any abuse occurring in the home, though T.B. reported M.B. had hit T.B. with a spatula. Ms. Cunningham testified she started to see T.B. after the children were removed from the home—T.B. expressed a desire to go home and denied any abuse occurred. Ms. Cunningham also stated she had a number of sessions with the parents and the family in a "variety of combination of sessions."

On cross-examination, Ms. Cunningham was asked about targeted-abuse victims. She testified generally as to potential harm to children who witness a sibling being abused by their parents. When asked if there would be a concern for the siblings in the home if a targeted child were removed, she stated:

There are a variety. One concern could be that once the targeted child is gone, other children could become targeted. Another concern could be that again, more—I'm speaking from a mental health standpoint, that we are discussing attachment issues, emotional issues, delays in overall life functioning.

DHS worker Laura Hansen completed the initial abuse assessment and testified she believed the children were in need of assistance because of T.B.'s report of abuse of M.B.:

> I consulted with my supervisor with the assistance of the County Attorney, Stephanie Brown, and based on the past case we certainly felt that was the issue those children were kept out of the home for an extended period of time. And again, given the services that have been provided before and that we're revisiting the situation I didn't believe that I could say that those children were safe in the home.

When asked if she believed A.M., A.T., and T.B. could be returned home safely, Ms. Hansen said she "would have serious concerns" because:

> Well, that testimony by the witnesses indicated that they've had similar problems with lying and stealing with the other children, that they've indicated the use of physical discipline, and I recall from the last review report in the service file that there was concern about [Alicia's] anxiety being taken out on [M.B.] If [M.B.] is not in the home, then the determination is for one of those children being targeted either for those same behaviors that set her off with regard to [M.B.]

Ms. Hansen acknowledged she did not interview either Alicia or Christopher in completing her assessment. She also acknowledged that the children went to school on a consistent basis and none of the children had reported abuse to school personnel. She acknowledged that no child other than M.B. reported having been abused by Alicia or Christopher and that she had not seen any physical injuries on any of the children.

Ms. Swoboda testified she provided therapy to M.B. between 2012 and 2014 and then again beginning in February 2017.[5] She was asked, "Do you have any training or knowledge of what a targeted child is?" Ms. Swoboda

---

[5] Ms. Swoboda testified M.B. had instances of misbehavior in the foster home after removal.

stated, "I certainly know the phrase. I would not say that I have had specific training on a targeted child." She testified generally about her understanding of a "targeted child." The State's attorney asked her,

> Q. If only a targeted child is removed from the home, are there any concerns for leaving the remainder of the children in the home? A. You're asking me a theoretic question?
> Q. I'm sorry. A. You're asking me theoretically?
> Q. Yes, theoretically. A. One of the things that would have to be addressed in the event that the children remain in home—the children remain in the home, is that the parent or the parents would really want to be looking with the assistance of some skilled and trusted professionals at what the entire environment in the home is and can become in the presence of stress in order that that can be changed—beneficially changed.

Alicia denied any physical abuse of M.B. or the other children. She acknowledged Christopher had hit M.B. in the mouth but noted it was a "tap" with two fingers. Alicia stated she had never seen Christopher hit or threaten any of the children with a belt.

Christopher admitted he had spanked both M.B. and T.B. and had "popped" T.B. and M.B. in the mouth. He also acknowledged he had threatened to spank M.B. with a belt but denied having actually used a belt. Alicia and Christopher both testified they would continue to use physical discipline in the home if they deemed it appropriate.

Ms. Jones was asked, "[I]s it common for one child who has been targeted for abuse for another child to be abused in that home?" She responded, "I don't know if I'd use the word common. I think it happens in some cases, and in some cases it doesn't happen. Largely I think it depends on what the reason for the abuse of the targeted child was for."

The guardian ad litem (GAL) asserted at the close of the evidence that she did not recommend again removing D.B. from the parents as he had already experienced too many moves. She recommended A.M. remain with his father, argued A.T. and T.B. should be confirmed CINA, and advocated that the parties "work to transition these children home following the advice" of Ms. Swoboda.

The juvenile court ordered the immediate return of A.T. and T.B. to Alicia and Christopher, "under the proviso there can be no physical discipline of those children—no physical contact to discipline the children."

In a written ruling issued on April 26, 2017, the juvenile court found though physical punishment was used in the home,[6] the State had failed to prove its claim that M.B. was a "targeted child" and once removed from the home another child would become the target of abuse. The court found "there was insufficient expert testimony to establish their claim of [a] 'targeted child.' Witnesses testified they heard [about] 'targeted child' but no one claimed expertise in this area. Second, facts do not support the assertion M.B. was 'targeted.'" The juvenile court also found [M.B.]'s interview was not credible, noting that per the psychological evaluation M.B. directed her negative emotions towards others in her life and "obviously does not like" Alicia. It also found Alicia's testimony to be "credible and compelling," noting Alicia "has struggled to work with a difficult stepdaughter and obtain appropriate assistance. It has not worked." The court concluded the children were not at risk of physical abuse or neglect and ordered the CINA petitions dismissed.

---

[6] The court wrote it "does not condone either parent physically disciplining [M.B.]—given her trauma history."

The State appeals, as does the children's GAL. Alicia and Christopher contend the State failed to prove these children are at risk of harm. The attorney for T.B. and A.T. asserts there was no showing they are at risk of harm.

**II. Scope and Standard of Review.**

We review CINA proceedings de novo. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). The State bears the burden to prove its allegations by clear and convincing evidence. Iowa Code § 232.96(2). "Clear and convincing evidence" must leave "no serious or substantial doubt about the correctness of the conclusion drawn from it." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002) (citation omitted). We accord considerable weight to the factual findings of the juvenile court, especially concerning the credibility of witnesses, but we are not bound by those findings. *In re W.G.*, 349 N.W.2d 487, 491–92 (Iowa 1984). Our primary concern is the best interests of the children. *Id.* at 492.

**III. Discussion.**

The State and GAL assert the children are at risk of imminent harm based on the father and mother's use of physical discipline targeting M.B. They contend the physical discipline likely will be directed at another child now that M.B. is out of the home.

A child is defined as a CINA under section 232.2(6)(b) if a parent "has physically abused or neglected the child, or *is imminently likely to abuse or neglect* the child." (Emphasis added.) In a similar vein, under section 232.2(6)(c)(2), a child is in need of assistance if the child "has suffered *or is imminently likely to suffer* harmful effects as a result of . . . [t]he failure of the

child's parent . . . to exercise a reasonable degree of care in supervising the child." (Emphasis added.)

Physical abuse or neglect in this context means "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child." *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014) (citation omitted). The "injury" or "harm" suffered "pertains to the physical, mental or social welfare of a child." *Id.* (citation omitted). "The most important consideration in any CINA case is the best interests of the child." *D.D.*, 653 N.W.2d at 362.

Here, there was testimony about concern for the children in Alicia and Christopher's home based on prior findings related to M.B., and with her being out of the home, the possibility another child will become the target of the parents' behavior. The State asserts our statutory scheme reflects "[t]his common sense notion, that abuse of one child in the home places others in the home at risk sufficiently to justify court supervision." The State cites a journal article[7] for the proposition, "[I]f the target child is removed from the home, a sibling may become the new target of his or her parents' abusive behavior."

On our de novo review, we conclude the State has proved its allegations that A.T., T.B., and D.B. are CINA by clear and convincing evidence.

A.M. is in his father's care outside the home of Alicia and Christopher. A.M. has not seen Alicia since November 2016 and will remain in Michael's care. There is no evidence A.M. is at risk of physical or emotional harm if not

---

[7] Nancy Wright & Eric Wright, *SOS (Safeguard Our Survival): Understanding and Alleviating the Lethal Legacy of Survival-Threatening Child Abuse*, 16 Am. U. J. Gender Soc. Pol'y & L. 1, 20–21 (2007).

adjudicated a CINA. *See In re A.C.*, No. 08-1215, 2008 WL 4531458, at *2 (Iowa Ct. App. Oct. 1, 2008) (holding CINA adjudication based on imminent harm was not supported by clear and convincing where the record lacked evidence of abuse towards the child at issue and the child was not in the father's care).

We are left then with the assertion that A.T., T.B., and D.B. may be at risk of physical or emotional harm as a result of abuse, neglect, or lack of supervision because M.B. is no longer in the home. The testimony centered on "concerns" that these children would become the focus of parental anger because M.B. was no longer in the home. We agree with the juvenile court that no expert testimony was presented that would support this assertion.

Notwithstanding, upon our de novo review, we conclude there is clear and convincing evidence to support CINA adjudication as to the A.T., T.B., and D.B. The dismissals of the CINA petitions suggest that we will protect a child with behavior issues from abusive parents or custodians, but we will not protect other children in the home from the same parents or custodians. Although raising a child with behavioral issues is challenging, to say the least, there are other parents that do not physically abuse their behaviorally-challenged child. Until the root of the abusive behavior is resolved, all children in the home remain at risk of imminent harm. *See D.D.*, 653 N.W.2d at 362 ("Prior decisions likewise reflect the common sense notion that, ordinarily, all siblings are at risk when one child has been sexually abused.").

Moreover, Christopher admitted once hitting T.B. in the mouth, and both Christopher and Alicia believe physical discipline is appropriate at times. Their

definition of physical discipline also extends beyond spanking. And, even if Alicia has not participated in abusive behavior, she clearly has been unable to protect M.B.—and on at least one occasion, T.B.—from physical abuse levied by Christopher. If the abuse to M.B. was a brief or isolated circumstance, we might reach a different conclusion.

Furthermore, Christopher and Alicia have created or permitted a home environment contrary to the best interests of the children by the habitual and cruel mental and physical abuse inflicted upon M.B. Although the effect upon a child of observing one or two incidents of abuse may require expert testimony, we have no difficulty concluding adverse consequences may arise where the conduct is pervasive and unavoidable. We conclude such adverse consequences rise to the level of A.T., T.B., and D.B. being imminently likely to suffer harmful effects as a result of a failure to exercise a reasonable degree of care in supervising the children. *See* Iowa Code § 232.2(6)(c)(2).

We therefore reverse the dismissal of the CINA petitions as to A.T., T.B., and D.B. and remand for further proceedings with directions for entry of an order adjudicating A.T., T.B., and D.B. to be children in need of assistance pursuant to Iowa Code section 232.2(6)(b) and (c)(2). We express no opinion on the proper disposition to impose. We affirm the dismissal of the petition with respect to A.M.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

Tabor, J., concurs; McDonald, J., concurs in part and dissents in part.

**MCDONALD, Judge** (concurring in part and dissenting in part).

I concur in part and dissent in part. I concur with the majority in affirming the dismissal of the petition to adjudicate A.M. in need of assistance. I respectfully disagree with the majority in reversing the dismissal of the petitions to adjudicate A.T., T.B., and D.B. in need of assistance.

Section 232.2(6)(b) requires proof that a parent or guardian "has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Iowa Code § 232.2(6)(b). "But 'physical abuse or neglect' and 'abuse or neglect' are terms of art in this context. Within chapter 232, 'physical abuse or neglect' and 'abuse or neglect' mean 'any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child.'" *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014) (quoting Iowa Code § 232.2(42)). The majority concludes this section can be satisfied by showing the child suffered injury or harm pertaining to the physical, mental, or social welfare of a child. The language quoted by the majority relates to the definition of "harmful effects" to the child within the meaning of section 232.2(6)(c)(2). *See J.S.*, 846 N.W.2d at 41 (distinguishing the two provisions). Section 232.2(6)(b) requires proof of nonaccidental physical injury or an imminent likelihood of the same.

Section 232.6(c)(2) requires the State to prove the children have suffered or are imminently likely to suffer "harmful effects" as a result of the parents failure "to exercise a reasonable degree of care in supervising the child." "Harmful effects" has a broad definition. *See id.* The State can satisfy its burden by

establishing there was "harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur." *Id.*

Like the juvenile court, I conclude the State failed to prove by clear and convincing evidence either of these grounds with respect to A.T., T.B., or D.B. "Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995). "It is the highest evidentiary burden in civil cases." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). "It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* It is a demanding standard. A standard not met here.

There was no expert witness who supported the State's theory of targeted abuse. There was no expert witness who testified M.B. was a target of child abuse within the meaning of this theory. There was no expert witness who testified this family demonstrated the characteristics and behaviors consistent with those engaging in targeted-child abuse. There was no expert witness who testified the children at issue would be at increased risk of abuse if M.B. was adjudicated in need of assistance and removed from the home. The majority concedes there was no evidence to support the State's theory of targeted child abuse. The State's theory of targeted abuse was simply legal argument without any supporting evidence. The juvenile court correctly rejected the State's unsupported theory.

There was strong evidence the children at issue are not at risk of harm. The mother and father denied physical abuse of the children. The juvenile court found the mother's testimony to be credible and compelling. The mother testified regarding the difficulties of parenting M.B. and the parents' use of discipline in the house. The father did the same. The parents both testified about their attempts to obtain help for M.B. in treating her mental-health conditions and help in learning how to manage M.B., including their efforts outside of any child-welfare proceeding. This supports the district court finding that the family is struggling to manage a difficult child. For example, the father admitted to "popping" M.B. in the mouth once. He explained he "found out [M.B.] was going to school and she was using racial slurs towards other boys and just saying a lot of vulgar stuff. She had admitted to saying it. I popped her in the mouth and said, we don't say these things." Under the circumstances, this lone incident does not rise to the level of physical abuse.

There is strong evidence from persons with long-standing relationships with the family supporting the conclusion the children at issue are not at risk of adjudicatory harm. The children's therapist testified she had no reason to believe any of these children, including M.B., were being targeted. She testified A.T. and T.B. denied any physical abuse. She testified A.T. and T.B. told her they want to go home. She testified the parents are concerned about the well-being of the children and are active in the children's lives. This was demonstrated in a colloquy during the hearing. T.B.'s attorney requested the mother be allowed to have contact with the child to attend the child's dance recital in Chicago, which

the State resisted. The attorney made the request on behalf of the six-year old child who "really, really" wanted her mom to be there. According to T.B.'s attorney, T.B. "doesn't understand what's going on, why she doesn't live in the home right now, and it's very important for her to have her mom present." This does not sound like the request of a child at risk of harm.

A former DHS worker, who is now a therapist and who was formerly involved with this family in her capacity as a DHS worker, testified she would recognize a "targeted child" and she did not believe the parents were targeting M.B. or the other children.

One of the mother's coworkers, Dr. Mow, testified at trial. He testified the mother would bring the children into the office after school before going to after school activities. Dr. Mow testified he saw the children frequently. He testified, as a colleague of the mother, he did "curb side consults" regarding the children, including looking at rashes, ear pain, injuries, etc. He testified, as a mandatory reporter, he never saw any sign of child abuse. Specifically, he testified he had a chance "to look at them closely, exam [sic] them though their heart, lungs, that type of stuff, look at the extremities. I've never seen any signs of abuse or any sign of being battered."

Friends and family supported the testimony of the professionals. The family's next-door neighbor watches D.B. The other children come to the neighbor's house in the morning before school. She sees them almost every day of the school year. She testified the children "were very well cared for." She

testified she never saw any signs of abuse. She testified she did not believe it possible that any of the children were abused.

After the children were removed from the home, they were placed with a family friend. She testified the parents have been supportive of her during the pendency of the case. They have given financial support to the children. The caretaker of the children testified she had not seen any signs of abuse with respect to any of the children during the time she has known the family. She testified she had no concerns of the children being in danger or harm if returned to the parents.

In contrast to this evidence, the juvenile court found M.B.'s allegations were not credible. Specifically, the juvenile court found M.B. was dishonest and "was trying to come up with answers/stories" when asked questions about abuse during her interview with the regional child protection center. The credibility finding is supported by other record evidence. M.B.'s treating mental-health professionals and the psychological evaluations conducted before the initiation of this case and during this case show M.B. is low functioning, in the borderline range. She loses control of her thoughts and feelings, and "strong emotional reactions are particularly likely to interfere with her ability to perceive events accurately." M.B. exhibited controlling behaviors, was dishonest and sneaky, instigated conflict, and directed her negative attention toward her stepmother as the primary target of M.B.'s hostility.

The juvenile court also made unusually strong credibility findings regarding the DHS worker involved with this family. The juvenile court "believe[d]

the DHS worker lost her objectivity re: this family and focused merely on their past," the "DHS worker clearly did not like the parents," and the "personal animosity [on the worker's part] was palpable and disturbing." The juvenile court found the department to be so biased against the family that it entered an order directing "DHS to regain their professional objectivity" regarding this family. The juvenile court's credibility determination was supported by the record. The State's witnesses repeatedly referred to prior proceedings and not the allegations at issue in this proceeding. I interpret the juvenile court's strongly worded rebuke of the DHS and its employees to mean the worker's testimony was biased and should be afforded little to no weight.

Although our review is de novo, we give deference to juvenile court opinions for reasons both institutional and pragmatic. *See Hensch v. Mysak*, No. 17-0348, 2017 WL 4050671, at *1 (Iowa Ct. App. Sep. 13, 2017); *In re P.C.*, No. 16-0893, 2016 WL 4379580, at *2 (Iowa Ct. App. Aug. 17, 2016). Credibility determinations, especially, are the particular province of the trial court. *See P.C.*, 2016 WL 4379580, at *2; *see also In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994). The juvenile court heard testimony and argument for six days spread out over the course of several weeks. The juvenile court had the opportunity to observe the parents and the witnesses and make credibility determinations based on its observations. I would afford the juvenile court's credibility findings greater deference than the majority does in reviewing the evidence.

I would affirm the juvenile court's finding that M.B. is a difficult child and her parents occasionally disciplined her inappropriately. That blame lies with

them and not with her. However, there is no showing of inappropriate discipline of the children at issue in this case, and there is no proof of the "targeting" theory in this home. There is not clear and convincing evidence the children at issue are at risk of adjudicatory harm if returned to the care of the parents. Indeed, the juvenile court ordered D.B. to be returned to the parents prior to the completion of the adjudication hearing. The State unsuccessfully sought interlocutory review of that decision. D.B. remained in the care of the parents throughout the remainder of the proceedings without incident. If anything, it seems the risk of harm, if any, has been diminished following M.B.'s removal from the home. For the foregoing reasons, I would affirm the juvenile court's decision to dismiss all four CINA petitions. Therefore, I concur in part and dissent in part.