In the Interest of N.M.W., A Child.

Appeal of B.W., Mother.

No. 89–1620.

Court of Appeals of Iowa.

Aug. 30, 1990.

Mark D. Reed and Douglas V. Coonrad of Douglas V. Coonrad, P.C., Hudson, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee State.

Heard by DONIELSON, P.J., and SCHLEGEL and HABHAB, JJ., but decided en banc.

HABHAB, Judge.

Appellant, B.W., appeals the adjudication of the juvenile court determining N.M.W. to be a child in need of assistance (CINA) and the subsequent dispositional order directing continued foster care of N.M.W. We affirm.

The child in question is a girl born in July 1983. Her parents are not married to each other. She lived with her mother from the date of her birth until 1989.

The family has had involvement with the Department of Human Services since at least 1984. Over the years, the Department has prepared several abuse reports. The primary concern has been extreme filth in the mother's home, although there have also been concerns about inadequate food in the home, inadequate supervision of the child, and refusal of services by the mother.

On April 12, 1989, N.M.W. was found in front of a house a block from B.W.'s residence. When the police were unable to locate her home, they took N.M.W. to the police station. N.M.W. informed the authorities her mother had told her to go outside. B.W. claimed the child had just taken off without her knowledge. From statements made by law enforcement officers concerning the condition of B.W.'s apartment, a child protective worker visited B.W.'s apartment.

When the worker, who was accompanied by a police officer, approached the apartment, the stench of cat feces and urine became noticeable. Inside the apartment, the worker discovered the entire front room to be strewn with a collection of garbage, clothing, and other general clutter. Ashtrays were found filled to overflowing with some knocked over. Windows and screens were missing and garbage ma-

terials were embedded in the carpet. A side closet was packed with a mixture of clutter and refuse. A bedroom was filthy with garbage. Additionally, two litters of cats were living under the bed. Apparently a total of eleven to twelve cats lived in the apartment.

The same squalid conditions existed in the kitchen. The floor was filthy and the garbage container was left uncovered. The refrigerator had smeared food on parts of it and was empty of food except for milk, eggs, and ketchup. Dishes were stacked in the sink, on the counter, and on the table. Also, a cat box filled with cat excrement was found in the kitchen. In the bathroom, the cats had defecated along the bathtub and some of N.M.W.'s clothing was stuck to the feline fecal material. Because of the filthy apartment, N.M.W. stayed with a friend of B.W.

On April 14, 1989, the child protective worker returned to B.W.'s apartment. The squalid conditions still existed. Likewise, the conditions had not improved by April 17, 1989, when the worker again returned to the home. The worker returned again on April 20th to find B.W. had made limited improvement. Later visits to B.W.'s home found the unsanitary conditions unabated.

Following hearing on the matter, the juvenile court made a CINA determination as to N.M.W. At the initial hearing, the State presented evidence concerning three prior child abuse reports. The three reports had formed the basis for a prior CINA proceeding in which the juvenile court had dismissed the petition.

■ Our review of CINA proceedings is de novo. Accordingly, we review both the facts and the law, and adjudicate rights anew as to those issues which have been properly preserved and presented. *In re D.L.*, 401 N.W.2d 201, 202 (Iowa App.1986). We accord considerable weight to the fact findings of the juvenile court, especially concerning the credibility of witnesses, but we are not bound by those findings. *In re W.G.*, 349 N.W.2d 487, 491–92 (Iowa 1984),

*cert. denied,* 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). Our supreme concern lies with the child's welfare and best interests. *In re D.L.*, 401 N.W.2d at 202.

## I.

■ Initially, B.W. argues the trial court erred in finding the existence of sufficient evidence to establish N.M.W. as a child in need of assistance. Iowa Code section 232.2(6)(g) defines CINA as an unmarried child:

> Whose parent, guardian, or custodian fails to exercise a minimal degree of care in supplying the child with adequate food, clothing or shelter and refuses other means made available to provide such essentials.

We find clear and convincing record evidence to support the juvenile court's determination that N.M.W. is a child in need of assistance.[1]

The chronic unsanitary conditions of B.W.'s apartment are of sufficient magnitude to form the basis for a CINA adjudication. We take judicial notice of the health hazards of having animal fecal materials scattered throughout one's living quarters. While the record does not disclose any adverse health effects of this environment on N.M.W., the child's well being demands that action be taken to prevent actual harm. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

■ B.W. also asserts the juvenile court erred in considering B.W.'s past actions which formed the basis for prior CINA proceedings. We disagree. In considering what the future holds for a child if returned to the parent, the Iowa Supreme Court noted in *Dameron:*

> Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

306 N.W.2d at 745. We find no error in permitting such evidence as long as there

---

1. Our affirmance of the juvenile court's CINA determination is premised solely on Iowa Code section 232.2(6)(g).

is other clear and convincing evidence that forms the basis of the current CINA proceeding. We find such other clear and convincing evidence independent of the prior CINA proceedings.

## II.

■ B.W. next alleges the juvenile court erred in not dismissing the juvenile proceeding due to a violation of rule 4.5, Iowa R.Juv.P. Rule 4.5 provides:

> The adjudicatory hearing on a child in need of assistance petition shall be held within sixty days of the filing of said petition unless good cause to the contrary is shown. Failure to comply with this rule shall not result in automatic dismissal, but any such failure may be urged as grounds for discretionary dismissal.

The initial petition in this matter was filed on May 2, 1989. The juvenile court, by order of June 5, 1989, set the matter for hearing on July 17, 1989. On July 5, 1989, B.W. filed her motion to dismiss. The juvenile court overruled said motion on July 19, 1989. The reason for the delay in setting this matter for hearing does not appear of record. However, finding no prejudice befell B.W. as a result of the delay, we conclude the juvenile court did not abuse its discretion in not dismissing the petition. *Cf. In re A.E.O. III*, 437 N.W.2d 238, 239–40 (Iowa 1989) (failure to conduct review hearing in CINA proceeding within six months of dispositional hearing did not warrant dismissal absent showing of prejudice). This opinion should not be read to mean that we condone the setting of CINA adjudicatory hearings beyond the period provided by rule 4.5, for we do not. But when this does occur, the parties should bring it to the juvenile court's attention on the earliest date possible.

## III.

■ Finally, B.W. challenges the juvenile court's decision at the dispositional hearing to place N.M.W. with the Iowa Department of Human Services. We find no error in this order. B.W. was given numerous opportunities to clean and sanitize her apartment, but failed to rectify the situation. The juvenile court quite appropriately informed her that she could resume custody of N.M.W. when she removed the pets and cleaned the apartment. B.W.'s choice in this case was either her cats or her child; so far she has chosen her cats. We find no error in the juvenile court's dispositional order.

## IV.

There are certain parts of the dissent that need addressing. The dissenter claims she is concerned because the majority decision may be interpreted as setting standards for housekeeping that need to be met before we allow parents to keep their children. We fail to find anything in the opinion to justify such concern. Our concern in its simplified term is with the child's welfare and best interests.

We just do not believe that this child should be compelled to live under the circumstances we set forth on pages 479 and 480 of this opinion which we again repeat:

> When the worker, who was accompanied by a police officer, approached the apartment, the stench of cat feces and urine became noticeable. Inside the apartment, the worker discovered the entire front room to be strewn with a collection of garbage, clothing, and other general clutter. Ashtrays were found filled to overflowing with some knocked over. Windows and screens were missing and garbage materials were embedded in the carpet. A side closet was packed with a mixture of clutter and refuse. A bedroom was filthy with garbage. Additionally, two litters of cats were living under the bed. Apparently a total of eleven to twelve cats lived in the apartment.
>
> The same squalid conditions existed in the kitchen. The floor was filthy and the garbage container was left uncovered. The refrigerator had smeared food on parts of it and was empty of food except for milk, eggs, and ketchup. Dishes were stacked in the sink, on the counter, and on the table. Also, a cat box filled with cat excrement was found in the

kitchen. In the bathroom, the cats had defecated along the bathtub and some of N.M.W.'s clothing was stuck to the feline fecal material. Because of the filthy apartment, N.M.W. stayed with a friend of B.W.

On April 14, 1989, the child protective worker returned to B.W.'s apartment. The squalid conditions still existed. Likewise, the conditions had not improved by April 17, 1989, when the worker again returned to the home. The worker returned again on April 20th to find B.W. had made limited improvement. Later visits to B.W.'s home found the unsanitary conditions unabated.

We, too, agree that parents who devote time and attention to their children, who allow their children to have pets and projects in their home are contributing substantially to their children's emotional development. But that is a much different setting than requiring a child to live in the stench of cat feces and urine. It is also much different than to require a child to live in a home that is strewn with a collection of garbage, clothing, and other general clutter. It is also different than requiring the child to live in a home where the cats defecated along the bathtub where some of the child's clothing was stuck to the feline fecal material.

We have no quarrel with the position of the dissenter that recommends that the State take a more active role in assisting the mother in cleaning this home so that the child may be returned. We encourage it. But until that time, is it really fair to the child to require the child to return to the mother's home as it is presently constituted? We think not.

The juvenile court, who had the first-hand opportunity to observe and talk with the mother, explained the options available to her. When we give meaningful consideration to the best interest of this child and couple the circumstances with the help given by the State, we do not believe the options to be insurmountable.

AFFIRMED.

All Judges concur, except SACKETT, J., who dissents.

SACKETT, Judge (dissenting).

I dissent. Over twelve months ago N.M.W., a happy, healthy five-year-old child was removed from her biological mother's care and placed in foster care where she remains today. The majority has determined the child must remain in foster care.

The reason for the removal, and the decision the child should remain in foster care, is that the mother is an inadequate housekeeper and does not keep what the majority terms a sanitary house. I agree with the majority that the record clearly supports a finding this mother is an extremely poor housekeeper. I agree with the majority it would be in the child's best interests to live in a cleaner house. However, the house could have been cleaned without taking the child from her mother. I do not, however, feel removal from the parental home was in the child's best interests and feel the matter should be remanded to direct reasonable efforts be utilized to allow the child to return home. Houses can be cleaned, but the trauma a child experiences when he or she is removed from the only parental home he or she has ever known can cause emotional scars that can last a lifetime.

There is strong authority that parenting deficiencies may best be addressed by leaving the child in the home, that removals from biological families are traumatic for children, and that foster care placement is wrought with problems. *See* Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care and Termination of Parental Rights*, 28 Stan.L.Rev. 623, 638 (1976). Additionally, the difficulties I see occur with foster placements convince me the state, despite conscientious efforts by dedicated persons, is ill-equipped to parent.

Our legislature has recognized that children are best served by remaining in their home and requires reasonable efforts be made to allow them to remain there. Fed-

eral legislation providing states' reimbursement for foster care directs that reasonable efforts be made to allow a child to remain in his or her home, and a state's failure to do so can result in the loss of funds for foster care reimbursement.

To apply reasonable efforts first requires identifying the problem. The problems identified by the majority are the poor housekeeping conditions in the home, and the inability of the mother to correct these deficiencies. After identifying the problem, the next step is to look at the family as a unit and determine what it takes to correct this problem.

If this mother came from a higher economic level, she could do as many parents do who have neither the desire or ability to clean their houses. She could hire a cleaning service. I would consider reasonable efforts to entail granting this mother assistance with cleaning her house and keeping it clean. A few hours of cleaning service would have cost the state less than the judicial time and court appointed attorney fees spent to litigate the adequacy of this woman's housekeeping skills through the state's appellate courts. And most importantly, the child would not have suffered the trauma of removal and the insecurities that come in foster care.

The majority decision also concerns me because it may be interpreted as setting standards for housekeeping that need to be met before we allow parents to keep their children. If I were convinced: (1) only people in clean houses were good parents, (2) for a child to be healthy it is necessary for him or her to be raised in a sanitary house, and (3) a child suffers less by being removed from his or her parents than from growing up in a dirty house, I could agree with the majority. I am not convinced of these things. I consider parents who devote time and attention to their children, who allow their children to have pets and projects in their home, and who welcome their children's friends in their home are contributing substantially to their children's emotional development. Parents who seek to direct their financial and emotional resources in these directions may have few resources left to keep a sanitary house.

If we concentrate too much on sanitary houses, we may take children away from good and adequate parents, and we may use energies and resources that would best be directed to helping families and to identifying children who suffer serious abuse.