MOORE, Judge.
H.B. ("the mother") appeals from a judgment entered by the Mobile Juvenile Court ("the juvenile court") terminating her parental rights to H.M.P. ("the child"). We reverse the juvenile court's judgment.
Procedural History
On February 12, 2016, the Mobile County Department of Human Resources *878 ("DHR") filed a petition to terminate the parental rights of the mother and P.P. ("the father").[1] After a trial, the juvenile court entered a judgment terminating the parental rights of the mother and the father to the child. In its judgment, the juvenile court determined the child to be dependent and found, in pertinent part:
"Since obtaining custody of said child, [DHR] has offered services to the mother, and made all reasonable efforts to promote reunification. Said unification efforts failed due to the failure of the mother to accept services, or to amend her circumstances for the best interests of the child."
The juvenile court found that no other viable alternatives existed and that "termination of [the] parental rights of the [mother] is in the best interests of the child to promote permanency."
Facts
The evidence in the record indicates that the mother was diagnosed at age 22 with psychosisschizophrenia after suffering a mental-health breakdown following the death of her grandmother. The mother suspended taking her medication for that illness when she became pregnant with the child, who was born on January 30, 2007. She resumed taking the medication two to three months later, but at a different dose than as prescribed.
In 2008, when the child was approximately 18 months old, DHR removed the child from the one-bedroom apartment the mother shared with her mother ("the maternal grandmother") and the child. The mother and the maternal grandmother testified to a dispute between the mother and a neighbor, which, they claimed, had possibly led to the neighbor's reporting the mother for failing to properly supervise the child. The mother testified that, on that occasion, she was on the front porch of the apartment while the child was inside the apartment in a high chair within the mother's sight. The mother said that she became stressed when DHR arrived to take the child away. When the child was removed, the mother said, she asked for an ambulance, which took the mother to a local hospital. Natasha Dysert, a DHR worker who was "not on the scene that day," testified that DHR had been called due to the mother's erratic behavior and that, upon arrival at the mother's apartment, DHR workers discovered the child unattended in the doorway of the apartment; according to Dysert, drug paraphernalia had also been found inside the apartment. At that time, the mother, who, according to Dysert, was in the parking lot, reported that she had been shot in the head and that people were trying to run over her with a car.
The mother testified that she had been hospitalized following the 2008 incident. Dysert testified that, at the time of that incident, the mother was off the medication she had been prescribed for her mental illness but that changes in her medication had been made by the doctors who treated her. The mother testified that the doctors had stabilized her medication. Dysert testified that the mother had complied with DHR's family-reunification plan, which included a psychiatric evaluation, and the child was returned to the custody of the mother in 2010.
The child resumed living with the mother and the maternal grandmother in the same one-bedroom apartment. When the family planned to move from those premises in 2012, the management inspected the apartment and found 28 or more cats and *879 a dog living there. DHR investigated and determined that the apartment was unsanitary and unsuitable for the child, so the child was again removed from the custody of the mother. The maternal grandmother testified that the mother was overly compassionate to animals and had regularly taken in strays. Charlene Clemons, the DHR social worker who oversaw the 2012 case, testified that DHR had established goals for the mother, including obtaining alternative housing and maintaining her mental health. According to Clemons, the mother had met those goals and the child was returned to the custody of the mother in December 2013 subject to DHR's supervision for the following six months. At that time, the mother and the maternal grandmother were residing in a three-bedroom house that the maternal grandmother had begun renting in 2012.
On August 31, 2015, DHR was called to the family's house by police officers who were serving an arrest warrant on the mother for theft of property. Natasha Reyes, the DHR social worker who responded to that call, testified that, when she arrived at the house, the house did not have running water or electricity and was in an unsanitary condition due to trash, cat waste, and bugs. The mother testified that the electric and water services to the house had been cut off for approximately six months after the maternal grandmother had lost her employment and could not afford to pay the bills. DHR removed the child from the mother's custody and placed the child into foster care. DHR requested that the mother undergo a psychological evaluation, attend parenting classes, and work with "FOCUS" in-home services, which the mother initially declined; the mother did, however, visit with the child.
On January 19, 2016, DHR changed its permanency plan from reunification with the mother to adoption. Sarah Jernigan, a DHR social worker, took over the case on March 8, 2016. Jernigan testified that the mother had begun cooperating with DHR's requests by undergoing a psychological evaluation in May 2016 and by participating in "Tools of Choice" in-home services. The mother testified that she had completed parenting classes. Jernigan testified that she had allowed the child to visit with the mother in the rental house in which the mother and the maternal grandmother resided after concluding that the house was suitable for the child. The maternal grandmother testified that she had resumed gainful employment and that she had paid all the necessary fees to restore electric and water services to the house. Jernigan testified that, at the time of the trial, the mother had made progress and was nearing completion of all of the goals DHR had set for her. The mother testified that she was given two years' probation on the theft-of-property criminal charge and that she was ready, willing, and able to regain custody of the child.
There was no evidence of harm to the child, which the mother denied and which DHR did not attempt to prove. The mother testified that she had taken prenatal vitamins when she was pregnant with the child and that the child had been born "in perfect health." Dysert testified that, in 2008, the child had been found in a high chair, which, she admitted, was an appropriate place for the child to be. The mother testified that the child was never in danger. DHR discovered that the child had not yet been immunized, but no one testified that the child's immunization treatment was overdue. The mother testified that she and the maternal grandmother had paid to have the child immunized during the time the child was in DHR's custody between 2008 and 2010. The mother also testified that she had attended all of the child's medical appointments during that period.
*880 Although DHR removed the child due to the conditions of the apartment in 2012, no witness testified that the health of the child had been adversely affected by those conditions. The mother testified that the child had slept in the bedroom "away from the cats," which, she testified, had stayed in the front room of the apartment. The mother testified that after the child was returned to her custody, the mother and the maternal grandmother had cared for the child by feeding, clothing, entertaining, and educating the child. The mother and the maternal grandmother celebrated birthdays and other holidays with the child by giving her toys and presents. No one from the child's school ever questioned the care the child received.
Reyes testified that when she removed the child from the mother's custody in 2015, the child was in good physical condition and was clean. The mother testified that the child was never ill or malnourished, but was at a healthy weight. Although the family's house was without electric service and running water for a period, the child had informed Reyes that, during that time, she had been eating out and had also eaten frozen dinners that had thawed to room temperature. The maternal grandmother and the mother testified that they had improvised by using gallons of water to flush the toilet as well as occasionally staying at a motel to bathe. They both testified that, despite the lack of electricity and running water, the child had been kept well-groomed, had never missed a meal, had always had shelter, had always attended school on time, and had received help with her homework. According to the maternal grandmother, the child had earned good grades while in her and the mother's care, maintaining a "B" average. Jernigan testified that the child is bonded with the mother and the maternal grandmother and that they display love for one another.
The mother was 37 years old at the time of the trial. She has been regularly taking two Haldol tablets per day for her mental illness, as well as undergoing therapy once a year at Altapointe, a mental-health facility. She also visits Altapointe every three months for the purpose of monitoring her medication. Veronica Davis, a licensed professional counselor who was called as an expert witness by DHR, testified that the mother was "stabilized" at the meeting they had had on May 18, 2016. The mother testified that she had not had a mental-health crisis since 2008, when DHR first removed the child from her custody. The mother testified that her mental illness does not impair her ability to care for the child. The maternal grandmother and the mother both testified that the mother could care for the child independently.
Issue
On appeal, the mother argues that the evidence does not support the juvenile court's findings that she failed to successfully rehabilitate herself and adjust her circumstances to meet the needs of the child or that termination of her parental rights serves the best interests of the child.
Standard of Review
A judgment terminating parental rights must be supported by clear and convincing evidence, which is " ' "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." ' " C.O. v. Jefferson Cty. Dep't of Human Res., 206 So.3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4) ).
*881 " '[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved.'
" KGS Steel[, Inc. v. McInish,] 47 So.3d [749] at 761 [ (Ala. Civ. App. 2006) ].
"To analogize the test set out ... by Judge Prettyman [in Curley v. United States, 160 F.2d 229, 232-33 (D.C. Cir. 1947),] for trial courts ruling on motions for a summary judgment in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden'; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.' "
Ex parte McInish, 47 So.3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So.2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So.3d 878, 879 (Ala. Civ. App. 2011).
Discussion
Section 12-15-319, Ala. Code 1975, provides, in pertinent part:
"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[ ] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[ ] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[ ]."
In order to terminate parental rights under § 12-15-319, a juvenile court must be clearly convinced from the evidence that the parent cannot or will not provide adequate care for the child. See S.U. v. Madison Cty. Dep't of Human Res., 91 So.3d 716, 720 (Ala. Civ. App. 2012).
In deciding whether a parent is unable to properly parent a child, the juvenile court must consider, among other factors, "[t]hat reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed" and the "[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review." § 12-15-319(a)(7) & (12). In its judgment, the juvenile court found that DHR's efforts at rehabilitation had failed and that the mother had not adjusted her circumstances to meet the needs of the child. The record does not contain clear and convincing evidence to sustain those findings.
*882 Once DHR places a child in foster care, it has an immediate duty to use reasonable efforts to reunite the family, absent aggravating circumstances. See Ala. Code 1975, § 12-15-312. That duty requires DHR to identify the circumstances that led to removal of the child, to develop a plan to ameliorate those circumstances, and to use reasonable efforts to achieve that plan. See Montgomery Cty. Dep't of Human Res. v. A.S.N., 206 So.3d 661, 672 (Ala. Civ. App. 2016) (citing H.H. v. Baldwin Cty. Dep't of Human Res., 989 So.2d 1094, 1105 (Ala. Civ. App. 2007) (opinion on return to remand) (authored by Moore, J., with two judges concurring in the result)).
The mother argues that DHR removed the child solely because of the lack of electric service and running water at the family's house. Cf. M.G. v. Etowah Cty. Dep't of Human Res., 26 So.3d 436, 444 (Ala. Civ. App. 2009) (indicating that the mere absence of utilities would not be sufficient to terminate parental rights). Actually, Reyes testified that DHR had removed the child from the custody of the mother "[d]ue to inadequate shelter and [the mother's] being arrested for stealing ...."[2] By "inadequate shelter," Reyes explained that she meant not only the absence of electric service and running water, but also the "deplorable" unsanitary condition of the house. Although Alabama law has not been clear on this point, other states have recognized that a child can be permanently removed from the custody of a parent who allows chronic, recurring unsanitary conditions to endanger the health of the child. See, e.g., In re J.W., 921 P.2d 604 (Alaska 1996) ; Browning v. Arkansas Dep't of Human Res., 85 Ark. App. 495, 157 S.W.3d 540 (2004) ; In re Paul E., 39 Cal.App.4th 996, 46 Cal.Rptr.2d 289 (1995) ; In re A.H., 842 A.2d 674 (D.C. 2004) ; Idaho Dep't of Health & Welfare v. Doe, 149 Idaho 653, 239 P.3d 451 (Ct. App. 2010) ; In re N.M.W., 461 N.W.2d 478 (Iowa Ct. App. 1990) ; In re Interest of E.R., 230 Neb. 646, 651, 432 N.W.2d 834, 838 (1988) ; In re Lillian R., 196 A.D.2d 503, 600 N.Y.S.2d 756 (1993) ; and In re Interest of J.R., 501 S.W.3d 738 (Tex. App. 2016). A fair reading of the record indicates that DHR removed the child primarily for that reason.
In her brief to this court, the mother correctly notes that DHR did not assist her with restoring the utilities, which the maternal grandmother independently accomplished, but the mother overlooks that DHR did schedule classes and in-home services designed to improve the mother's housekeeping abilities, the main obstacle to family reunification. Even after the mother initially refused those services, DHR continued to offer them to the mother. Thus, we conclude that DHR used reasonable efforts to reunite the family in this case.
The real issue in this case is not whether DHR used reasonable efforts, but whether those efforts failed. See T.B. v. Cullman Cty. Dep't of Human Res., 6 So.3d 1195, 1199 (Ala. Civ. App. 2008). Rehabilitation efforts succeed when those circumstances that led to the removal of the child have been resolved, id., so that the child can safely be returned to his or her parent's custody. See Ala. Code 1975, § 12-15-301 (12) (defining "reasonable efforts" as including "[e]fforts made ... to *883 make it possible for a child to return safely to his or her home"). Conversely, if DHR has proven by clear and convincing evidence that the parent remains unable to adequately care for the child after reasonable efforts have been expended to rehabilitate the parent, the juvenile court may find that those reasonable efforts have failed. T.B., supra.
In this case, the evidence in the record indicates that DHR had not yet completed the rehabilitation process at the time of the trial. Nevertheless, the mother had adjusted her circumstances to alleviate the conditions that had led to the removal of the child. The house from which the child was removed was no longer in the "deplorable" condition that existed in 2015. Jernigan testified that the house was suitable for the child. DHR did not present any evidence suggesting that the mother lacks the mental or physical ability to maintain the house in a suitable condition. To the contrary, Jernigan testified that the mother had made considerable progress by the time of the trial. The record does not contain clear and convincing evidence indicating that the mother remained unable to properly care for the child.
"[T]he existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun Cty. Dep't of Human Res., 859 So.2d 439, 444 (Ala. Civ. App. 2003).
"Although a juvenile court certainly can consider a parent's past child-rearing history, see Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993), legislative policy, see M.G.[ v. Etowah Cty. Dep't of Human Res.], 26 So.3d [436,] 442 [ (Ala. Civ. App. 2009) ], as well as constitutional due-process concerns, see Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), require that a parent's parental rights be terminated based on clear and convincing evidence of that parent's present inability or unwillingness to care for the children that is likely to persist in the foreseeable future."
S.U. v. Madison Cty. Dep't of Human Res., 91 So.3d at 723. The conditions at the time of the trial showed that the child could safely be returned home.
A juvenile court can terminate parental rights in situations in which it is convinced that a parent has only temporarily corrected a recurring condition that threatens the welfare of the child. See J.W.M. v. Cleburne Cty. Dep't of Human Res., 980 So.2d 432, 438-39 (Ala. Civ. App. 2007) (plurality opinion). Although the juvenile court expressed concerns about the number of times the child had been removed from the custody of the mother, "in each instance, DHR'S decision to remove the child from the mother's custody appears to have been taken as a precautionary measure and not as a result of actual threats or allegations of abuse or neglect of the child." C.P.M. v. Shelby Cty. Dep't of Human Res., 185 So.3d 461, 466 (Ala. Civ. App. 2015). The undisputed evidence in the record shows that the child has never been harmed by the mother. Despite her poor housekeeping skills, the mother had always safeguarded the child from the squalor around her. Reyes specifically testified that the child was in good physical condition and was clean when taken into DHR's custody in 2015. DHR did not present any admissible evidence to contradict the testimony of the mother that the child has always been healthy and well-groomed despite her otherwise poor living conditions. See In re Paul E., 39 Cal.App.4th at 1005 n.8, 46 Cal.Rptr. 2d at 294 n.8 (pointing *884 out that "[t]he absence of ill effects is a way of distinguishing a loving-but-dirty-home case from a case of real neglect).
To be sure, a child should not be subjected to living in unsanitary conditions, but the termination of a loving relationship between a child and his or her parent should occur only in the most egregious of circumstances. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). The evidence shows that the child has thrived under the care of the mother, having bonded with her maternal grandmother, making good grades, and celebrating milestones. The child, who is now 10 years old, shares an emotional and loving relationship with the mother. Jernigan even testified that DHR had scheduled counseling to prepare the child for the possibility that the juvenile court would terminate the mother's parental rights. A parent should not lose his or her fundamental right to the custody of his or her child, and a child should not be forced to undergo the anguish of losing his or her parent and extended family, just because the parent is not a model homemaker. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In these circumstances, it is hard to see how termination of the mother's parental rights would serve the best interests of the child. Therefore, we conclude that the juvenile court erred in terminating the parental rights of the mother. We therefore reverse the juvenile court's judgment and remand the cause for the entry of a judgment consistent with this opinion. In light of our disposition of this issue, we pretermit the remaining issues raised by the mother.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Pittman and Donaldson, JJ., concur.
Thompson, P.J., dissents, with writing, which Thomas, J., joins.

The father failed to appear before the juvenile court, and he has not appealed. Therefore, we will not discuss the petition or the judgment insofar as they relate to the father.

DHR also presented evidence regarding the mother's mental illness. However, the undisputed evidence indicates that the mother was stable at the time of the trial. Furthermore, the juvenile court did not find that the mother's mental illness prevented her from properly caring for the child, although the juvenile court was required to consider that question. See Ala. Code 1975, § 12-15-319(a)(2).