Rel: October 17, 2025

Notice: This opinion is subject to formal revision before publication in the advance sheets of <u>Southern Reporter</u>. Readers are requested to notify the Reporter of Decisions, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in <u>Southern Reporter</u>.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

───────────────────────

## CL-2025-0101, CL-2025-0102, CL-2025-0103, CL-2025-0104, and CL-2025-0105

───────────────────────

## K.C.M.

## v.

## Madison County Department of Human Resources

### Appeals from Madison Juvenile Court
### (JU-22-46.02, JU-22-47.02, JU-22-48.02, JU-22-49.02, and JU-23-448.02)

FRIDY, Judge.

K.C.M. ("the mother"), appeals from five substantively identical judgments of the Madison Juvenile Court ("the juvenile court") terminating her parental rights to D.M.B., Jr., who was born in November 2014; J.T.M., who was born in May 2017; C.K.B. and T.K.B.,

CL-2025-0101, CL-2025-0102, CL-2025-0103, CL-2025-0104, and CL-2025-0105

twins who were born in May 2018; and S.M.M., who was born in May 2019.[1] For the reasons set forth herein, we reverse the juvenile court's judgments.

Background

On June 5, 2024, the Madison County Department of Human Resources ("DHR") filed separate petitions seeking to terminate the parental rights of the mother to D.M.B., Jr., J.T.M., C.K.B., T.K.B., and S.M.M. ("the children"). The juvenile court scheduled a bench trial in each case for August 20, 2024. On August 8, 2024, DHR filed in each case a motion to continue the bench trial in which it asserted that it needed time to complete a psychological assessment and a parenting assessment of the mother. It indicated that it had scheduled those assessments with Dr. Barry Wood for September 14, 2024. The juvenile court granted

---

[1]The judgments also terminated the parental rights of D.M.B., Sr. ("the father"), the legal father of D.M.B., Jr., C.K.B., T.K.B., and S.M.M. At the time of trial, the father was incarcerated following his conviction for attempted sodomy of a child and was serving a sentence with a mandatory minimum release date of July 2032. The father did not appeal the judgments terminating his parental rights, so our recitation of the evidence is limited to the evidence pertaining solely to the mother. The father of J.T.M. is unknown; his name does not appear on J.T.M.'s birth certificate, and the mother did not provide the name of any alleged father of J.T.M.

CL-2025-0101, CL-2025-0102, CL-2025-0103, CL-2025-0104, and CL-2025-0105

DHR's motions to continue and set the bench trial in the cases for December 3, 2024.

The mother did not appear for her psychological assessment with Dr. Wood on September 14, 2024. The assessment was rescheduled and conducted on November 13, 2024. Dr. Wood completed his report of the assessment on December 2, 2024, the day before the scheduled bench trial.

On December 2, 2024, the mother filed in each case a motion to continue the trial in which she asserted, among other things, that, although she had completed the psychological assessment, the results of that assessment had not yet been made available. She argued that her counsel needed additional time to confer with her and to review the assessment results in preparation for the trial. However, she effectively withdrew those motions at the beginning of the trial the next day when her attorney received a copy of the report of the assessment and indicated that she had reviewed that report with the mother and was prepared to proceed with the trial.

Lisa Sutter, a DHR caseworker assigned to the matter on March 17, 2022, testified at the trial that DHR first became involved with the

mother and D.M.B., Jr., J.T.M., C.K.B., and T.K.B. in November 2021 when the mother was operating a vehicle in which the four children were occupants and crashed the vehicle into a trash can. The mother tested positive for alcohol and marijuana at the scene of the accident, was arrested, and was transported, along with the four children, to the hospital for treatment. Sutter explained that the four children were subsequently placed with their maternal grandmother and their maternal grandfather pursuant to a safety plan. According to Sutter, S.M.M. was not placed with the maternal grandparents under that safety plan because, she said, DHR was not aware of the existence of S.M.M. and did not become aware of her existence until April 2023, when, she said, she learned that the mother had executed a written agreement pursuant to which she had agreed for D.M., a maternal aunt of the children, to care for S.M.M.

Sutter testified that the safety plan with the maternal grandparents failed when the maternal grandparents twice tested positive for marijuana. In February 2022, a second safety plan was implemented, pursuant to which the four oldest children were placed with Z.M., a maternal aunt of the children, B.M., a maternal uncle of the

children, and D.M. At some point, that placement failed after Z.M. tested positive for marijuana and D.M. failed to submit to a drug screen within a required period DHR had set. The four children were then placed in foster care in Huntsville, where they remained at the time of the termination-of-parental-rights trial.

Evidence in the record indicates that, in February 2022, D.M.B., Jr., was placed with one foster parent, and J.T.M., C.K.B., and T.K.B. were placed with another foster parent, R.N. In July 2022, the four children were all placed with R.N. In March 2023, D.M.B., Jr., and J.T.M. ("the sons") were placed with their paternal great-aunt and great-uncle in McCalla, with the stated goal being placement of C.K.B. and T.K.B. in that home if the transition with the sons proved successful. On April 19, 2023, however, the paternal great-aunt and great-uncle contacted DHR and requested that the sons be removed from their care; the sons were returned to Huntsville. Although the record is unclear whether they reentered R.N.'s care or were placed in another foster home, testimony from the children's guardian ad litem indicates that C.K.B. and T.K.B. were removed from R.N.'s home and placed with their current foster

parent, B.H., with whom they have remained for approximately three years.

According to Sutter, when DHR learned of the existence of S.M.M. on April 25, 2023, DHR considered placing her with D.M. and Z.M. under a safety plan; however, she said, D.M. tested positive for marijuana and Z.M. failed to submit to a drug screen. Despite repeated efforts to work with D.M. as a relative-placement option, D.M. tested positive for marijuana on two additional occasions. The guardian ad litem testified that S.M.M. was then placed with B.H., and she remained in that placement at the time of the trial.

Sutter testified that DHR initially attempted to place the children together, but, she said, DHR was unable to locate a foster home that could accommodate all five. At the time of the termination-of-parental-rights trial, the sons were placed with L.G., and C.K.B., T.K.B., and S.M.M. ("the daughters") were placed with B.H. Both Sutter and the guardian ad litem confirmed that the daughters share a bond with B.H. The guardian ad litem further testified that B.H. was willing to adopt the daughters.

Sutter confirmed that the sons recently had been placed with L.G. and that they had known him since March or April 2024. Sutter and L.G.

testified that L.G. provided respite care for D.M.B., Jr., when he had had his tonsils removed, during which time the sons stayed at L.G.'s house for most of the day and then returned to their foster parent's house at night because the foster parent was unable to care for the sons during the day. L.G. further testified that the sons are familiar with his siblings and his parents, that he intends to adopt the sons, and that they share a bond with him.

Sutter testified that DHR conducted a total of 18 individualized-service-plan ("ISP") meetings with the mother between January 10, 2022, and December 2, 2024. At the initial ISP meeting, the mother was required to complete a drug assessment with Aletheia House, to participate in color-code drug testing, to complete parenting classes, and to attend weekly supervised visitation with the children. At the February 8, 2022, ISP meeting, DHR agreed to provide the mother "Medicaid Rehab Services." By February 18, 2022, the ISP notes reflect that the mother was participating in intensive outpatient drug-rehabilitation classes with Aletheia House and in parenting classes; DHR agreed to provide bus passes, "transportation and sitter service," and assistance

with a "housing program and letter." Sutter testified that the mother completed the required parenting class in February 2022.

Sutter further testified that DHR identified stable housing and employment as additional concerns affecting the mother's ability to parent. At the March 17, 2022, ISP meeting, the mother's ISP was amended to include obtaining stable housing and employment. Additional services were added as ISP meetings progressed. At the June 2022 ISP meeting, the mother agreed to participate in counseling and in-home services, and DHR agreed to assign Donnie Thompson, a DHR service provider, to provide those services; DHR also agreed to provide gas vouchers to assist the mother with attending her appointments at Aletheia House and her color-code drug testing. Sutter confirmed that DHR provided gas vouchers and bus passes and that the mother completed a substance-abuse assessment for Aletheia House on July 19, 2022.

By the May 2023 ISP meeting, the mother's ISP indicated that the mother would consider calling Thrive Alabama "for her medical needs." Based on the record, it is unclear what "medical needs" were identified at that time. Sutter testified that, around that time, the mother completed

another substance-abuse assessment for Aletheia House and that Aletheia House did not recommend treatment at that time; the mother was, however, asked to continue color-code drug testing. Thompson testified that she assisted the mother with supervised visitation, transportation, in-home counseling, parenting, housing, and employment services.

Sutter testified that the mother initially lived with the maternal grandparents because she had been evicted from her federally subsidized housing for owing $1,378.60. Sutter said that the mother could not secure new federally subsidized housing until she repaid that amount, which, Sutter said, "[the mother] worked hard to do it herself." Sutter confirmed that the mother ultimately secured federally subsidized housing and that DHR assisted her with that process. DHR's efforts included having the mother provide a budget to allocate her future expenses, agreeing to work with the mother on a down payment for an apartment, and recommending the housing authority "as the primary option for housing." Sutter testified that the mother provided a budget but that she had included only expenses and no income.

Sutter testified that stable income was one of the mother's "biggest issues" and that the mother was unable to maintain employment. She explained that, although the mother claimed that she had been employed with ALDI, a grocery-store chain, since October 2024, her investigation revealed that ALDI had no record of having employed the mother, and the mother was unable to provide the name of a supervisor when asked. Thompson testified that the mother had a history of employment instability and terminations.

Thompson testified that she began providing the mother with weekly counseling services on June 29, 2022, which, Thompson said, included counseling regarding the mother's ability to maintain sobriety. She said that the mother completed 14 counseling sessions in 2022, 31 sessions in 2023, and 8 sessions in 2024, the last of which, Thompson said, occurred on November 26, 2024. Thompson and the guardian ad litem expressed concern that the mother had issues with consistency.

Sutter testified that the mother was required to submit to drug screens twice each month, with concerns focused on alcohol and marijuana. The mother tested negative on December 18, 2023; tested positive for alcohol on January 12 and February 1, 2024; failed to appear

for tests from February 15 through July 5, 2024; and tested negative on July 9, 2024. The mother did not submit to any drug screens after July 9, 2024. When she was asked if she had requested that the mother submit to drug screens at the ISP meetings held on August 12 and October 31, 2024, Sutter replied in the affirmative. She stated, however, that the mother failed to comply with those requests. Sutter said that the mother was scheduled to complete a drug assessment with New Horizons on November 26, 2024, because, according to Sutter, the mother was having difficulty contacting someone at Aletheia House. Sutter further testified that New Horizons had no record of the mother's appointment. Sutter found it concerning that the mother had not demonstrated sobriety since July 2024 and testified that the results of screenings help "prove stability."

Thompson said that she started monitoring the mother's visits with the children on April 15, 2022. She testified that the mother sometimes went months without visiting the children and that, in December 2022, she visited the four oldest children only once. Sutter testified that Thompson accommodated the mother's schedule and allowed her to select visitation locations. Thompson explained that she frequently had to

encourage the mother to attend visits so that she could maintain a relationship with the children. According to Thompson, she normally had to encourage the mother to attend visitation with the children, and, she said, the mother attended most visits only because of her encouragement. Sutter testified that, in 2024, the mother was offered twice-monthly visitation, for a total of 22 possible visits, but she attended only 11. The mother last visited the children in October 2024. Although she was given the opportunity to increase visitation by providing four consecutive negative drug screens, she failed to meet that requirement.

Sutter testified that she observed the mother's interaction with the children during visitations, and, she said, "they love her. They love her a lot. Um, especially the [sons]." She added that the children "really care about [the mother]." Sutter also testified that the children love and talk about their maternal grandparents, aunts, and uncle.

Sutter testified that she was not certain when the mother was asked to complete a mental-health assessment at WellStone, but, she said, she believed that DHR had discussed sending the mother there. When asked whether the mother was seeing a therapist, Sutter testified that, when she visited WellStone in November 2024 inquiring about the

mother, WellStone employees had informed her that WellStone did not have any records for the mother. The ISP notes from January 2022 until August 2024 do not indicate that the mother had been required to complete a mental-health assessment.

The notes from an ISP meeting held on August 12, 2024, reflect that DHR recommended that the mother create a plan for after-school care for the children and provide a list of five individuals who would be a part of her "support system"; Sutter added that the mother provided some names. Sutter testified that, on August 12, 2024, the mother was referred for a psychological assessment with Dr. Wood, which was scheduled for "the first part of September." The record reflects that this was the first psychological service provided to the mother. The August 12, 2024, ISP notes reflect that the meeting with Dr. Wood was scheduled for September 4, 2024, at noon.[2] Sutter testified that the mother failed to attend the initial appointment with Dr. Wood and that she was unable to contact the mother because the mother had changed her telephone

---

[2]We recognize that the September 4, 2024, date referenced in the ISP differs from the September 14, 2024, date referenced in DHR's August 8, 2024, motion to continue the August 20, 2024, termination-of-parental-rights trial setting.

number. Later that month, Sutter was able to contact the mother; she provided the mother with Dr. Wood's contact information so that she could reschedule the evaluation.

Dr. Wood, a clinical psychologist specializing in assessment psychology, said that he assessed the mother on November 13, 2024. His assessment included completing a "Comprehensive Family Assessment," a clinical interview regarding the mother's personal and professional history, the Wechsler Adult Intelligence Scale, the Minnesota Multiphasic Personality Inventory-3 ("MMPI-3"), and the Parenting Stress Index-Fourth Edition. Dr. Wood said that the mother "responded honestly to the test" and did not exaggerate or minimize her problems.

Dr. Wood's written report from the assessment noted that the mother "likely provided an accurate portrayal of her psychological functioning." The report further stated:

> "Review of the Substantive Scales revealed recurrent indications [that the mother] experiences thought symptoms. Test results also revealed recurrent indications she experiences episodes of excitability, elevated mood, and impulsivity consistent with mania or hypomania. In addition, test results revealed some compulsive behaviors, worry, fears, self-dissatisfaction, and a history of significant misconduct as a juvenile. Among what were labelled 'critical items' by the MMPI-3 developers, [the mother] endorsed seven such items.

14

All seven of the items she endorsed related to aberrant thinking."

Dr. Wood explained that "mania" involves impulsive and sporadic thought processes lasting at least a week, while "hypomania" is similar in nature but generally lasts two or three days. He further explained that "critical items" are "individual test items which are so powerful that they are of particular note," and he testified that the mother had "the worst like seven of them" and that "the worst were odd thinking."

Dr. Wood noted the mother's family history of depression and schizophrenia. He testified that, given the objective indications from an honest MMPI-3 with no exaggeration -- namely, the presence of mania or hypomania, coupled with aberrant thought processes -- he was concerned that the mother had not received "aggressive treatment for a disorder of this severity." He explained that it is common for individuals with schizophrenia to use marijuana or alcohol in an effort to manage their symptoms, which he described as a secondary issue. He also explained that individuals with significant mood and thought symptoms often attempt to "self-medicate" with alcohol or marijuana.

He further testified that, although it was possible the mother suffered from bipolar disorder with psychotic features, the results of her

testing suggested that she likely had exhibited thought symptoms during the assessment even in the absence of active mania or hypomania. For that reason, he said, he believed that the mother likely suffers from a variant of schizoaffective disorder.

Dr. Wood testified that he had an "ethical obligation[] to come here today and tell [the juvenile court] this information" and that the mother should be given additional time to receive increased, targeted treatment for her foundational psychiatric symptoms in addition to treatment for alcohol abuse. He said that addressing those foundational psychiatric symptoms "puts a whole new flavor on the alcohol [abuse issue], even though there is a strong family history of that as well." He testified that there was "evidence that there [is] something a lot deeper going on … than just the alcohol," which, he said, made the case more complicated. He reiterated that the mother should be given additional time so that professionals could "find out what [is] really going on at the deepest level."

Dr. Wood recommended that the mother undergo a psychotropic-medication evaluation by a psychiatrist, whom he described as a "major player" in addressing her condition. He also recommended that she

participate in individual counseling for the foreseeable future and that she understand that continued alcohol use would likely necessitate more intensive substance-abuse treatment. He clarified that he was not suggesting that the mother was unable to work, but he explained that he was willing to provide a summary of her assessment for her use in applying for Social Security disability compensation because "the folks at disability need to know about this diagnosis." He testified that the mother has a "longitudinal thought disorder" and that, although there are no "quick fix[es]," her condition could "potentially" be managed to some degree. He added that he was aware of "high-placed individuals in the DHR system" who had been diagnosed with bipolar disorder "and are on serious medications and are absolutely doing a … spectacular job."

The juvenile-court judge then posed a series of questions concerning Dr. Wood's recommendation. Regarding the duration of psychiatric treatment, the following exchange occurred:

> "THE COURT: Okay. When you think somebody needs to be seeing a psychiatrist, what is the -- and I know it's individual based, but what is the prognosis on how long that treatment would go on?
>
> "[Dr. Wood]: I think that's a hard call. But I mean I would think you'd be looking six months to a year at least maybe to figure out what's going on.

17

> "THE COURT: Well, and therein lies the problem I've got and worry is the head that wears the crown I guess. If we were talking three or six months, I'd say, 'Okay. We can kick this down the road for three to six months.' But if we're talking about years, I've got children who need some permanency."

Dr. Wood added that it was possible that "significant things happen early" if a psychiatrist prescribed Abilify, Lamictal, or another antipsychotic medication to help stabilize the mother's mood.

The juvenile-court judge also inquired about the efficacy of psychotropic medications given the mother's family history of substance abuse:

> "THE COURT: What effect would a history of a family who continuously even to date is abusing drugs -- I'm not even going to throw in alcohol. I'm talking about using drugs and you don't force yourself in that situation and you stay there, I don't know that any professional help with psychotropic drugs is going to change that if you're not out of that situation.
>
> "[Dr. Wood]: I see your point. This is, this is like seeing through a glass darkly, okay? There's stuff going on. My findings say there's stuff going on. There's odd, twisted thinking. There are odd perceptions. There are things that we did not know about we now know about. So things are not firing on all eight, okay? Something is not working optimally. So when you're talking about subtle judgments, who should I hang around, who should I not hang around, she's depending on alcohol, if she is, to control her thought symptoms. Maybe she relies on other people, too. Maybe she's got some dependent personality features as well.

"THE COURT: Depending on the family, who may or may not have some of the same issues she has, but they've, they've shown no propensity to want to stop using drugs and she can't divorce herself from that crew. I guess the issue I'm having is what is kicking it down the road three, six months, nine months, a year for professional help if she's not going to purge herself of that situation?

"[Dr. Wood]: Well, I'm just saying, Your Honor, I, I cannot tell you that if she got aggressive treatment full bore that she would not make different decisions. That would certainly be the hope is that her judgment would improve commensurate with her, with her clarity of thought. And I just cannot tell you that. You know, I can't tell you. Maybe she'd have a, maybe she'd have a 45-degree turn. Maybe she wouldn't. I just don't know. But I'm saying that it's just -- it just feels wrong to me to take this untreated condition and kind of, and kind of ignore it -- And I'm not saying you're doing that, but I'm just saying for us to do that collectively, and just say, 'Well, it's really the alcohol.' 'Cause I'm not -- I'm just not sure it is just the alcohol. Or the dependency on other people. I'm not sure that that wouldn't clear up if she had aggressive treatment with all resources available, I'm not sure that she wouldn't draw some different conclusions.

"THE COURT: I could ask more questions, but they're all speculative in nature.

"[Dr. Wood]: Well, I appreciate you honoring me with those questions."

This colloquy led into a discussion concerning the mother's drug-screen results:

"THE COURT: I just -- You know, she's dependent on this family, like I say, that will not stop their drug usage, nobody no how no way.

"And then she didn't show up for five months for drug screens she knew she had to take. And the reasonable, rational conclusion of that is, 'Well, maybe I can't test 'cause I'm using illegal drugs.'

"[Dr. Wood]: Well, just to, just to counter that, that direction, what if her need to -- her self-perceived need to use alcohol and/or other drugs is dramatically greater than ours might be because we're not facing a cavalcade of thought symptoms and mood symptoms and stuff? That's the problem if you've got that underlying disorder.

"And I -- This is -- This concept is overused. I get it. I've been around it. But what I'm saying is I do not believe that she is on the same -- based on information I have today, I do not believe she is on the same playing field with us in terms of 'I'll just not do that.' So, yeah, I absolutely believe that she would evade, she'd know she was using. But what I'm saying her temptation to use, her drive to use is arguably a lot higher than would be ours that do not have psychiatric disorders. That's all I'm trying to say."

At the conclusion of the trial, the juvenile-court judge remarked: "In my six and half years, this is probably, based on the testimony of Dr. Wood, the most difficult termination I ever had to consider. Dr. Wood's concerns are my concerns."

On January 6, 2025, DHR filed substantively identical proposed judgments in each case, except J.T.M.'s case, in which it included a

20

paragraph concerning Dr. Wood's testimony. On January 9, 2025, the juvenile court adopted DHR's proposed judgments verbatim, terminating the mother's parental rights to the children.

In its judgments, the juvenile court found that the mother had been provided services by DHR, including family counseling, a mental-health assessment, a psychological assessment, individual counseling, parenting classes, supervised visitation, random drug screens, and assistance with securing stable housing. It further found that the mother had failed to adjust her circumstances to meet the children's needs and had been inconsistent in her participation during the pendency of the cases. In the judgment relating to J.T.M., the juvenile court acknowledged Dr. Wood's testimony that the mother needed "psychotropic assistance" and could possibly improve her situation to be able to parent, but it also noted his inability to provide a time frame necessary for the mother's improvement or to determine whether the mother "could improve her current situation and be able and willing to parent [J.T.M.] in the foreseeable future."

The juvenile court also noted that it had considered the mother's interactions with the children, her efforts to change her circumstances,

21

the absence of relative resources, the time allowed for change, DHR's reasonable efforts toward reunification, and the credibility of the witnesses in reaching its decision.

The mother filed a postjudgment motion in each case, which the juvenile court denied. The mother then filed a timely notice of appeal in each case, and this court consolidated the appeals.

## Standard of Review

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly ... establish the fact sought to be proved."

"'KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [(Ala. Civ. App. 2006)].

> "'... [F]or trial courts ruling ... in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254[, 106 S.Ct. 2505, 91 L.Ed.2d 202] (1986); thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'
>
> "Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011)."

Z.P. v. Mobile Cnty. Dep't of Hum. Res., 414 So. 3d 151, 154 (Ala. Civ. App. 2024).

## Analysis

The mother advances two arguments on appeal. First, she contends that clear and convincing evidence did not support the termination of her

parental rights. Second, she contends that the juvenile court erred in finding that DHR had made reasonable efforts to reunify her with her children. Because we find her latter contention dispositive of these appeals, we pretermit consideration of the former.

As part of her argument that DHR did not use reasonable efforts to reunify her with her children, the mother criticizes DHR's failure to order a psychological assessment of her until after it had filed its petitions to terminate her parental rights, and she points out that the results of that assessment were not made available until the day before the trial. She argues that, because DHR waited until the very end of the process to have her complete the psychological assessment, it never put in place the proper services to reunify her with her children. We agree.

"Once DHR places a child in foster care, it has an immediate duty to use reasonable efforts to reunite the family, absent aggravating circumstances. See Ala. Code 1975, § 12-15-312." H.B. v. Mobile Cnty. Dep't of Hum. Res., 236 So. 3d 875, 882 (Ala. Civ. App. 2017). "That duty requires DHR to identify the circumstances that led to removal of the child, to develop a plan to ameliorate those circumstances, and to use reasonable efforts to achieve that plan." Id. Put another way, "in the

24

absence of aggravating circumstances, DHR must make '"a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights."'" P.R.P. v. Marshall Cnty. Dep't of Hum. Res., [Ms. CL-2023-0899, Dec. 13, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024) (quoting H.H. v. Baldwin Cnty. Dep't of Hum. Res., 989 So. 2d 1094, 1104 (Ala. Civ. App. 2007) (plurality opinion), quoting in turn State ex rel. A.C., 97 P.3d 706, 712 (Utah Ct. App. 2006)).

"As part of the reasonable-efforts mandate, before a juvenile court can terminate parental rights on the ground that the parent has not successfully rehabilitated, the juvenile court must first give the parent a fair opportunity to rectify the barrier to family reunification." P.R.P., ___ So. 3d at ___. "A juvenile court can find that reasonable efforts at rehabilitation have failed only if DHR has proven by clear and convincing evidence that the parent has not made substantial progress toward becoming able to adequately care for the child after reasonable efforts have been expended to rehabilitate the parent." B.L. v. Elmore Cnty. Dep't of Hum. Res., 324 So. 3d 829, 837 (Ala. Civ. App. 2020) (citing H.B. v. Mobile Cnty. Dep't of Hum. Res., 236 So. 3d 875, 883 (Ala. Civ. App. 2017)).

25

In these cases, for reasons not explained in the record, DHR waited until the August 12, 2024, ISP meeting to identify undergoing a psychological assessment as a task the mother was to complete. This was more than two years after DHR began working with the mother and more than two months after it had filed the petitions seeking to terminate her parental rights to the children. The report of that assessment, which was not completed until the day before the trial and which the mother's counsel did not receive until the morning of the trial, revealed that the mother suffers from significant psychological issues.

Among other things, the testing showed that the mother experienced "thought symptoms" as well as "episodes of excitability, elevated mood, and impulsivity consistent with mania or hypomania." According to the report of the assessment, "[a]mong what were labelled 'critical items'" by the developers of one of the tests Dr. Woods administered to the mother, the mother "endorsed seven such items," all of which "related to aberrant thinking." In the report, Dr. Wood opined that the mother, despite being of average intelligence, "faces far more daunting challenges than are readily apparent." He noted that, while it was "possible she suffers from Bipolar Disorder With Psychotic

26

Features," he believed that the mother "most probably suffers from a variant of Schizoaffective Disorder," and he diagnosed her with "Schizoaffective Disorder, Bipolar Type." He recommended in his report that, because the findings from his testing represented new information, the mother "should be provided additional time to receive increased, targeted treatment of her foundational psychiatric symptoms in addition to treatment for alcohol abuse …." He further recommended that the mother receive medication for her condition as well as participate in individual counseling. As noted above, Dr. Woods's testimony was consistent with his report of the mother's psychological assessment.

During Dr. Woods's testimony, the juvenile-court judge expressed concern that treating the mother for the psychological problems identified by Dr. Woods would delay permanency for the children. However, that potential delay in permanency for the children was the direct result of DHR's failure to seek a psychological assessment of the mother for more than two years, waiting until after it had filed its petitions to terminate the mother's parental rights before doing so. As noted above, the law required DHR to identify, at the outset, the circumstances that caused the removal of the children from the mother's

27

custody, H.B., 236 So. 3d at 882, and, by delaying more than two years to seek a psychological assessment of the mother, DHR only belatedly identified, at a time when effective treatment would necessarily delay permanency for the children, what could be the most significant cause of that removal -- that the mother suffers from a type of schizoaffective disorder.[3]

In T.B. v. Jefferson County Department of Human Resources, 369 So. 3d 158 (Ala. Civ. App. 2022), evidence indicated that the Jefferson County Department of Human Resources ("the Jefferson County DHR") had failed to use reasonable efforts because it did not tailor services to a mother's identified barriers to reunification and that the record was "notable for what it d[id] not contain." 369 So. 3d at 163. No ISPs were discussed or admitted; there was no evidence indicating that the Jefferson County DHR had tracked the mother's progress; although

_____

[3]DHR complains about the mother's failure to appear for the first scheduled psychological assessment with Dr. Wood, which was scheduled for September 2024. The fact that the mother's failure to appear for that assessment resulted in a two-month delay (she participated in the assessment with Dr. Wood in November 2024) in no way exonerates DHR's more than two-year delay in ordering the psychological assessment as part of its obligation to identify those conditions necessitating removal of the children from the mother's custody.

substance abuse had been identified as a barrier, there was no evidence indicating that the Jefferson County DHR had arranged for or referred the mother to counseling recommended by an assessment; and there was no evidence indicating that the Jefferson County DHR had assisted the mother with finding appropriate housing, another identified barrier. Id. at 163-64. This court reversed the judgment in that case, holding that the Jefferson County DHR had not provided services reasonably directed at the obstacles to reunification. Id. at 164.

Here, the record reflects no documented requirement that the mother complete a psychological assessment in any ISP notes from January 2022 until August 2024, and DHR did not refer her for a psychological assessment until the August 12, 2024, ISP meeting, which was more than two months after it had filed its petitions to terminate the mother's parental rights, and the results of the assessment were not available until the day before the December 3, 2024, trial. Dr. Wood's assessment report identified untreated psychiatric needs, and he expressed concern that he had not seen the mother receive "aggressive treatment for a disorder of this severity."

Based on the undisputed evidence in the record, we find that the delay in identifying and addressing what could be a significant barrier to the mother's reunification with her children -- untreated mental illness -- parallels the deficiency in T.B. Put simply, by its delay in identifying the mother's mental illness, DHR made no efforts reasonably tailored to eliminating that barrier to the mother's reunification with her children. Having failed to do so, we are constrained to conclude that DHR did not expend reasonable efforts to rehabilitate the mother, B.L., 324 So. 3d at 837, and that the mother was not afforded "a fair opportunity to rectify the barrier to family reunification," P.R.P., ___ So. 3d at ___. We must, therefore, reverse the juvenile court's judgments.

## Conclusion

For the foregoing reasons, we reverse the juvenile court's judgments terminating the mother's parental rights to the children, and we remand the cases to the juvenile court for the entry of judgments consistent with this opinion.

CL-2025-0101 -- REVERSED AND REMANDED.

CL-2025-0102 -- REVERSED AND REMANDED.

CL-2025-0103 -- REVERSED AND REMANDED.

CL-2025-0101, CL-2025-0102, CL-2025-0103, CL-2025-0104, and CL-2025-0105

CL-2025-0104 -- REVERSED AND REMANDED.

CL-2025-0105 -- REVERSED AND REMANDED.

Moore, P.J., and Edwards, Hanson, and Bowden, JJ., concur.